309 Ga. 130
FINAL COPY

S20A0191. THE STATE v. PAULDO.

McMILLIAN, Justice.

A Laurens County grand jury indicted Raekwon Letavius Pauldo on one count of malice murder, one count of felony murder, and three counts of aggravated assault in connection with the death of Jacquel Smith. The trial court granted Pauldo's motion in limine to exclude the portions of his custodial interview with police after he invoked his rights to remain silent and to counsel on the ground that police failed to honor Pauldo's invocation of those rights by continuing to interrogate him.[1] The State appeals that ruling.[2] Because we conclude that police did not continue the interrogation,

---

[1] The motion also sought to suppress Pauldo's statements on the ground that they were the product of an illegal arrest in violation of the Fourth Amendment, but Pauldo's counsel did not argue this issue at the motion hearing. The trial court deemed the issue abandoned, and Pauldo did not file a cross-appeal contesting this determination.

[2] See OCGA § 5-7-1 (a) (4) (granting State right to appeal "[f]rom an order, decision, or judgment suppressing or excluding evidence illegally seized . . . in the case of motions made and ruled upon prior to the impaneling of a jury or the defendant being put in jeopardy, whichever occurs first").

that Pauldo reinitiated a conversation with police about the case, and that he knowingly, intelligently, and voluntarily waived his rights before further interrogation began, we reverse.

1.  We begin by setting out our standard of review. In general, this Court must accept a trial court's findings of fact on a motion in limine unless they are clearly erroneous. *Dozier v. State*, 306 Ga. 29, 33 (4) (829 SE2d 131) (2019).  However, because Pauldo's interview was both audio- and video-recorded, "the recording is part of the record on appeal, and the parties point to no evidence beyond the recorded interview to support their arguments regarding the admissibility" of the statement, "we review de novo the trial court's determinations of both fact and law." Id. (citations and punctuation omitted). See also *Johnson v. State*, 295 Ga. 421, 424 (2) (761 SE2d 13) (2014).

The record reflects that Pauldo's interview was conducted by a detective from the Dublin Police Department and attended by an agent from the department. The video recording of the interview shows that after making introductions, the detective told Pauldo

that he would have to read Pauldo "[his] rights." Pauldo asked in response whether he was being arrested, and the detective replied, "Not at this time." After asking Pauldo for biographical information, the detective read to Pauldo from a waiver-of-rights form the rights set out in *Miranda*.[3] Pauldo then unequivocally asserted his right to remain silent, explaining, "[M]y mom and my lawyer feel that I'm being more treated as . . . not a victim and [as] a suspect . . . . So they told me it would just be best if I did not speak with you guys." The detective clarified, "Okay, so you don't want to talk to us?" Pauldo replied, "No, sir." The detective then wrote, "Ray does not wish to talk to us" on the waiver-of-rights form.

It is at this point in the interview that the trial court found that the officers failed to scrupulously honor Pauldo's invocation of his right to remain silent. While the detective was writing on the form, the agent prompted him about a gunshot residue test. Immediately thereafter, the detective asked Pauldo, "[D]o you mind giving us some gun residue — [w]e're going to do a gun residue test." Pauldo

---

[3] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

then asked something unintelligible about "gun residue." The detective replied, "To see if you shot a gun today[,]" and asked Pauldo if he minded submitting to the test. When Pauldo asked if he had to consent to the test, the detective told him he did not have to consent but explained, "I'm going to get a search warrant and do it anyway." Pauldo responded, "Alright."

The detective then added "and the clothes that you have on, we're gonna have to take those. So, once you get out to the jail, once you take those off, we will take those as evidence."  In response, Pauldo asked again whether he was being arrested, and the detective confirmed that he was, despite having told Pauldo minutes before that he was not being arrested.  After Pauldo asked what he was being arrested for, the detective responded, "Homicide." Pauldo asked why, and the detective explained that they had talked to "a lot of people," and they had identified him as the shooter. Pauldo then started talking again, saying, "Sir," but the detective interrupted to say: "You've already told me that you wanted your lawyer here. They told you not to talk to me. Now, if you want to talk

to me, that's up to you." Pauldo replied that he did not understand why he was being arrested and that he "did not do this," asking again, "Why am I being arrested?" In response, the detective asked, "Ray, do you want to talk to me?" Pauldo replied, "I mean, I will talk to you. I'm sitting here; I'm talking to you now. I'm telling you, like, why . . . ." The detective again interjected, "Do you want to talk to me about this incident?" Pauldo replied, "I will talk to you about this incident, sir[,]" first stating that he was not there, then correcting himself to say that he was there, but asserting that he was not responsible for the shooting. Pauldo then asked the detective, "What [do] you want to know?"

At that point, the detective stated that if Pauldo wanted to talk to the detective, he needed to sign the waiver-of-rights form. The detective again asked Pauldo, "So you're changing your mind, and you want to talk to me?" Pauldo replied, "I will talk to you, yeah, to benefit me, anything . . . . I don't want to be arrested for homicide." In response, the detective instructed Pauldo to sign the form under the detective's handwritten statement that "Ray has changed his

mind and wishes to talk." Pauldo signed the form, the agent witnessed his signature, and the interrogation began. This entire exchange unfolded over approximately seven minutes on the video recording.

2. In reviewing the trial court's grant of Pauldo's motion in limine, which sought to exclude from evidence any statements he made after invoking his right to remain silent,[4] we start with the general principle that "[p]olice must scrupulously honor a suspect's right to remain silent if the person clearly and unambiguously states that he wants to end a custodial interrogation." *Brown v. State*, 304 Ga. 435, 440 (2) (b) (819 SE2d 14) (2018) (citations omitted). See also *Mack v. State*, 296 Ga. 239, 243 (2) (765 SE2d 896) (2014) ("[T]he admissibility of statements obtained after the person in custody has

---

[4] Although Pauldo's motion in limine was based on the invocation of the right to remain silent, the trial court, in granting the motion, found that Pauldo had invoked both the right to remain silent and the right to counsel. The State does not contest that finding on appeal. The right to remain silent and the right to counsel in this context both arise from the Fifth Amendment guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." See *McNeil v. Wisconsin*, 501 U. S. 171, 176 (II) (111 SCt 2204, 115 LE2d 58) (1991) (The invocation of the right to counsel during a custodial interrogation involves a right "found not in the text of the Sixth Amendment, but in this Court's jurisprudence relating to the Fifth Amendment.").

decided to remain silent depends under *Miranda* on whether 'his right to cut off questioning' was 'scrupulously honored' by law enforcement authorities." (citing *Michigan v. Mosley*, 423 U. S. 96, 104 (96 SCt 321, 46 LE2d 313) (1975)) (citations and punctuation omitted)). In determining whether police have scrupulously honored a defendant's right to remain silent, courts look to several factors, including the interrogating officers' immediate response to the invocation of that right and the interval of time separating the invocation from "subsequent police-initiated questioning." *Mack*, 296 Ga. at 243 (2). Thus, "when a person in the custody of law enforcement officers unambiguously and unequivocally invokes his right to remain silent in connection with their investigation, the *interrogation* must cease immediately." *Davidson v. State*, 304 Ga. 460, 468-69 (4) (819 SE2d 452) (2018) (citation omitted; emphasis supplied).

Likewise, "a suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made

available or until the suspect reinitiates the conversation." *Dozier*, 306 Ga. at 35 (4) (b) (citation and punctuation omitted). See also *Edwards v. Arizona*, 451 U. S. 477, 484-85 (II) (101 SCt 1880, 68 LE2d 378) (1981). This requirement, first established in *Edwards*, creates "a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." *Oregon v. Bradshaw*, 462 U. S. 1039, 1044 (103 SCt 2830, 77 LE2d 405) (1983) (plurality opinion). However, where police cease interrogation and the suspect initiates the conversation regarding his case, no violation of the *Edwards* rule occurs. Id. at 1046.

Therefore, whether a suspect invokes the right to silence or the right to counsel, or both, the first step in determining whether police honored the suspect's invocation of his rights is to examine whether interrogation ceased after the invocation. The analysis of what constitutes "interrogation" is the same whether a suspect invokes the right to remain silent or the right to counsel, because "[b]oth [rights] protect the privilege against compulsory self-incrimination

by requiring an interrogation to cease when either right is invoked."[5]

*Berghuis v. Thompkins*, 560 U. S. 370, 381 (III) (A) (130 SCt 2250, 176 LE2d 1098) (2010).

> In this context, "interrogation" is defined as "express questioning by law enforcement officers" or its functional equivalent — any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*State v. Brown*, 287 Ga. 473, 476-77 (2) (697 SE2d 192) (2010) (citations and punctuation omitted). See also *Menzies v. State*, 304 Ga. 156, 164 (IV) (816 SE2d 638) (2018) ("Interrogation for the

---

[5] Relying on *Edwards*, the dissent asserts that a defendant who invokes his right to counsel in a custodial setting has more substantial protections against further interrogation than a defendant who merely invokes his right to remain silent. While it may be correct that a defendant who invokes the right to counsel has a right to be free from further interrogation until an attorney is made available, *Edwards* and its progeny have also made it clear that if the defendant reinitiates the discussion with law enforcement, even in the absence of counsel, the defendant may be subjected to further interrogation. *Bradshaw*, 462 U. S. at 1045-46. Thus, the bright-line *Edwards* rule applies in both contexts, that is, police may not immediately subject a defendant who has invoked his right to counsel or his right to remain silent to further *interrogation* absent reinitiation by the defendant. See *Berghuis*, 560 U. S. at 381 (III) (A); *Arizona v. Roberson*, 486 U. S. 675, 680-82 (II) (108 SCt 2093, 100 LE2d 704) (1988); *Rhode Island v. Innis*, 446 U. S. 291, 302 (II) (B) (100 SCt 1682, 64 LE2d 297) (1980); *Everett v. Fla. Dept. of Corrections*, 779 F3d 1212, 1240-41 (VII) (A) (11th Cir. 2015).

purposes of *Miranda* warnings encompasses express questioning and words and actions that officers should know are reasonably likely to elicit an incriminating response from the subject." (citation and punctuation omitted)). "In determining whether the actions of law enforcement constitute an interrogation, courts look primarily to the perceptions of the suspect and not the intent of the officer." *Driver v. State*, 307 Ga. 644, 646 (2) (837 SE2d 802) (2020) (citation and punctuation omitted). Thus, the test for determining whether the officer could have expected that his communications would be reasonably likely to elicit an incriminating response is an objective one. See *Rhode Island v. Innis*, 446 U. S. 291, 301 (II) (A) (100 SCt 1682, 64 LE2d 297) (1980) (determination of whether police officers' communication constitutes interrogation made without regard to proof of the officers' underlying intent).

On the other hand, the law does not require that after a suspect invokes his right to remain silent or his right to counsel, law enforcement must leave the suspect's presence and cease all interaction with him immediately. See *Brown*, 287 Ga. at 479 (2).

"[P]olice statements and actions normally attendant to arrest and custody" are permitted and are not considered "the functional equivalent of interrogation." *Driver*, 307 Ga. at 648 (2) (b) (citation and punctuation omitted). That is because

> [a]fter a suspect invokes his rights, the police may be in a situation where they choose to, and appropriately and safely can, leave the suspect, but in other situations the police may need to transport the suspect from the crime or arrest scene to a detention center, or from an interrogation room to a detention center, or arrange for the suspect to contact his lawyer or family, or deal with other logistical issues.

*Brown*, 287 Ga. at 479 (2). Additionally, even after a defendant has invoked his rights, "[b]asic biographical questions asked in relation to an arrest are an exception to *Miranda* because such 'booking' questions are unrelated to the investigation and serve a legitimate administrative need and therefore do not qualify as 'interrogation.'" *Kirby v. State*, 304 Ga. 472, 476 (2) (b) (819 SE2d 468) (2018).

Once a defendant invokes his rights, subsequent statements by the defendant are admissible only if "the defendant himself initiates the communications with law enforcement authorities." *Mack*, 296

Ga. at 244 (2) (following invocation of the right to remain silent). See also *Dozier*, 306 Ga. at 35 (4) (b) (where defendant invokes the right to counsel, no further interrogation may occur in the absence of counsel unless defendant reinitiates the conversation); *Stewart v. State*, 286 Ga. 669, 671-72 (4) (a) (690 SE2d 811) (2010) (defendant's custodial statement admissible where he reinitiated communications after initially invoking his right to remain silent); *Morgan v. State*, 275 Ga. 222, 223-24 (4) (564 SE2d 192) (2002) (same); *Wilson v. State*, 275 Ga. 53, 58-59 (2) (562 SE2d 164) (2002) (same). As this Court recently explained, "initiation" under these circumstances[6] "requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand." *Driver*, 307 Ga. at 646 (2) (a) (citation and punctuation omitted). Moreover, "a suspect has 'initiated' renewed contact with law enforcement authorities, so as to permit further interrogation,

---

[6] In the context of whether a defendant initiated renewed conversation with police, "case law applying the definition of 'initiation' applies whether the suspect invoked his right to counsel or his right to silence." *Driver*, 307 Ga. at 646 (2) (a) (citation omitted).

only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." Id. (citation and punctuation omitted).

If it is determined that a suspect reinitiated communication with law enforcement, courts then must determine under the totality of the circumstances whether the suspect voluntarily, knowingly, and intelligently waived his rights under *Miranda*. See *Driver*, 307 Ga. at 646 (2) (a); *Wells v. State*, 307 Ga. 773, 776 (2) (838 SE2d 242) (2020); *Mack*, 296 Ga. at 243-44 (2). See also *Bradshaw*, 462 U. S. at 1046. In making that determination with respect to an accused who has invoked his rights, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U. S. at 484 (II).

> [W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the

accused.[7]

Id. at 482 (II) (citations and punctuation omitted).

3. With these principles in mind, we begin our analysis by examining whether the detective failed to scrupulously honor Pauldo's invocation of his rights under *Miranda*. Specifically, we must consider whether the requests[8] and statements the detective made after Pauldo invoked his rights constituted improper interrogation or its functional equivalent or whether they were more akin to permissible statements attendant to arrest, custody, and

---

[7] The dissent asserts that *Edwards* raised the standard for determining whether a defendant has voluntarily waived his right to counsel after initially invoking his rights. See *Maryland v. Shatzer*, 559 U. S. 98 (130 SCt 1213, 175 LE2d 1045) (2010). However, *Miranda* concluded that if interrogation continues after the invocation of the right to remain silent, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U. S. at 475. *Edwards* reconfirmed these views in the context of the invocation of the right to counsel so long as the defendant initiates the further communication. See *Shatzer*, 559 U. S. at 104 (II); *Roberson*, 486 U. S. at 680 (II). Thus, we see no material difference in the waiver analysis when a defendant invokes his right to counsel or right to remain silent or both as was the case here.

[8] The detective's initial mention of the gunshot residue test began as a request and turned into a statement that the test would be performed. He later made a clear request for Pauldo's consent. For purposes of analysis, we consider that the detective made two requests for consent to the gunshot residue test.

other logistical issues.

As an initial matter, we recognize that this case presents a close question because the detective's requests and comments about a gun residue test and his statement that Pauldo's clothing would be taken at the jail addressed procedures related to the collection of evidence for potential charges against Pauldo and immediately followed Pauldo's invocation of his rights. On the other hand, these requests and statements informed Pauldo about what was next in the process and were made in response to Pauldo's questions, similar to other statements that we have concluded were attendant to arrest and custody. We first address the requests for the gunshot residue test and then consider the detective's other statements.

*Requests for Consent*. Although no Georgia appellate court has directly addressed the circumstances under which police officers may request consent to collect evidence from a defendant who has invoked his rights, at least one other state court has determined that a request for consent to collect evidence from a defendant's person was not equivalent to interrogation in violation of *Miranda*, even

where the request occurred not long after the defendant invoked his rights. In *Commonwealth v. Letkowski*, 991 NE2d 1106 (Mass. App. 2013), aff'd, 15 NE3d 207 (Mass. 2014), the defendant was arrested and taken to the police station, where he was advised of his rights under *Miranda*. After the defendant indicated that he understood his rights and did not wish to waive them, he was taken to another part of the station for booking. When that process was completed, an officer approached and asked him to provide a DNA sample. The officer told him that he did not have to consent, but the defendant agreed to do so and signed a consent form. Approximately ten minutes after he submitted to the DNA test, the defendant waived his rights and gave police a statement, which he later sought to suppress on the ground that the officer's request for the DNA sample was the functional equivalent of reinitiating interrogation. The Massachusetts Appeals Court disagreed, concluding that a request for a DNA sample is similar to a request for a search and that asking for such consent was not interrogation in violation of the defendant's *Miranda* rights.  Id. at 1111 (3).

Other state courts also have held that a request for a DNA test is not interrogation, although the requests in those cases occurred after more time had elapsed following the defendant's invocation of rights. In *State v. Everett*, 893 S2d 1278, 1286 (III) (C) (Fla. 2004), police requested a DNA test several days after the defendant invoked his rights, and the defendant moved to suppress both the results of that test and the incriminating statements he made after the test. The Supreme Court of Florida held that the trial court did not err in denying that motion because the request for consent was not likely to elicit an incriminatory response. See also *State v. Heinonen*, 909 NW2d 584, 590-92 (I) (Minn. 2018) (where defendant invoked his rights at his house and was later approached at the jail for a DNA test, the request for the test and the officer's response to defendant's question as to why he was taking the test were not reasonably likely to elicit an incriminatory response). In a subsequent federal habeas proceeding in *Everett*, the Eleventh Circuit stated: "DNA collection by police is not interrogation of a suspect because it is not reasonably likely to elicit an incriminating

verbal response." *Everett v. Secretary, Fla. Dept. of Corrections*, 779 F3d 1212, 1244 (VII) (B) (11th Cir. 2015). The Eleventh Circuit accordingly determined that "the Florida Supreme Court reasonably concluded that the request for DNA consent—even though it followed Everett's invocation of his right to counsel under *Miranda*—did not violate his Fifth Amendment rights." Id.

Additionally, courts have concluded that asking for consent to search a defendant's property immediately after the defendant invokes his rights does not render a later statement by the defendant inadmissible. For example, in *United States v. Harmon*, 2006 WL 42083 (D. Kan., decided Jan. 6, 2006), the defendant invoked her rights and, shortly thereafter, law enforcement asked whether the defendant would consent to a search of her desk at work; told her that if she did not consent, law enforcement would apply for a search warrant; and further added that in the officer's opinion, a court would issue a warrant because of the "enormous amount of probable cause." Id. at *4. After the defendant consented, she spontaneously commented that her boyfriend had placed

something in her work desk but that she did not know what it was. Id. In denying the motion to suppress this statement, the district court reasoned that the request for consent was not an interrogation, that the statement was not in response to questions by the officers, and that the defendant voluntarily commented about the item in her desk. Id. at *6.

Likewise, in *State v. Cherry*, 362 P3d 313 (Wash. App. 2015), during a traffic stop and immediately after the defendant invoked his right to silence, a law enforcement officer asked for the defendant's consent to search his car. The defendant declined to consent and said that there were no drugs in the car because he had used them earlier in the day. During the search, the defendant also said that he had smoked methamphetamine and that there might be a pipe in his car. Id. at 320-21 (C) (3). The Washington Court of Appeals first held:

> The request for consent to search was not designed to elicit testimonial evidence and [defendant's] consent was not an incriminating statement. Therefore, law enforcement did not violate [defendant's] constitutional right to remain silent by requesting consent to search his

car after [defendant] had invoked that right.

Id. at 320 (C) (2). The court then held that the defendant's statements regarding drugs were admissible because they "were not made in response to any questioning likely to elicit an incriminating response." Id. at 321 (C) (3).

Moreover, in the related context when a defendant has invoked his rights, was asked to consent to a search immediately or shortly thereafter, and then sought to suppress physical evidence obtained from the consented-to search, the majority of courts that have considered the issue have concluded that a request for consent to search does not constitute interrogation or its functional equivalent.[9]

---

[9] In those cases, the courts have generally reasoned that asking for consent to search is not an interrogation in violation of *Miranda*, that a consent to search is not a self-incriminating statement, and therefore, that the Fifth Amendment provides no basis for suppressing the evidence found in the search. See, e.g., *United States v. Calvetti*, 836 F3d 654, 663 (II) (A) (6th Cir. 2016) (consent to search home after invocation of right to counsel); *United States v. Smith*, 3 F3d 1088, 1098 (V) (B) (1) (7th Cir. 1993) ("We have held that a consent to search is not a self-incriminating statement and, therefore, a request to search does not amount to interrogation." (citations omitted)); *United States v. Rodriguez-Garcia*, 983 F2d 1563, 1568 (I) (B) (10th Cir. 1993) (consent to search storage unit); *State v. Morato*, 619 NW2d 655 (¶¶ 23-24).

We are persuaded by these cases, particularly in light of the fact that the detective here made only brief statements and requests in connection with the collection of gunshot residue and did not otherwise comment on the strength of the evidence against Pauldo. Also, the requests were phrased in a way that allowed Pauldo to consent or not without giving an incriminating response. Cf. *Jackson v. State*, 272 Ga. 191, 194 (528 SE2d 232) (2000) (defendant's confession inadmissible where investigator commented that defendant's statement that he was not the shooter would be contradicted by a positive gunpowder residue test because investigator should have known comment would elicit an incriminatory response and defendant responded to the comment by

---

(S.D. 2000) (consent to search truck); *State v. Crannell*, 750 A2d 1002, 1009 (Vt. 2000), overruled in part on other grounds by *State v. Brillon*, 955 A2d 1108 (Vt. 2008) (same); *State v. Hooten*, 2013 WL 5436712, at *35-36 (II) (A) (Tenn. Crim. App., decided Sept. 27, 2013) (consent to search car); *State v. Baumeister*, 723 P2d 1049, 1050-51 (Or. App. 1986) (same). But see *State v. Britain*, 752 P2d 37, 39 (Ariz. Ct. App. 1988) (viewing "a request for a consent to search, after the right to counsel has been invoked, as interrogation" and as one ground for suppressing evidence); *Kreijanovsky v. State*, 706 P2d 541, 546 (Okla. Crim. App. 1985) (concluding under *Miranda* that "once an individual in custody requests an attorney, interrogating officers must not seek further consensual admissions, whether in the form of confession, consent to search, or waiver of other privileges").

confessing to the crime).  Thus, we conclude that the trial court erred in finding that the requests for consent to the gunshot residue test constituted interrogation in violation of Pauldo's invocation of rights.

(b) *Statements Regarding Search Warrant.* Turning to the detective's statements that he could get a search warrant for the gunshot residue test and that Pauldo's clothes would be collected for evidence at the jail, we note that these statements were short, were not open-ended, and did not invite further discussion about the details of the investigation. Cf. *United States v. Johnson*, 812 F2d 1329, 1331 (11th Cir. 1986) (inculpatory statement inadmissible where made after defendant invoked his right to counsel and the officer asked, "Do you want to know what will happen to you?"). Neither the requests to consent to a gunshot residue test nor the statement about the search warrant actually resulted in Pauldo providing an incriminating response. He neither agreed nor refused to submit to the test, and he simply acknowledged the detective's statement about the search warrant.

Moreover, the detective's statement about the search warrant was made only after Pauldo asked whether he was required to consent to the gunshot residue test. See *Driver*, 307 Ga. at 650 (2) ("[A] police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'") (citation and punctuation omitted). The statement about taking Pauldo's clothing at the jail appears to be a part of his response to Pauldo's question about consenting to the gunshot residue test, explaining that police would get a search warrant to obtain gunshot residue testing and that his clothes also would be taken as evidence at the jail. On balance and after a close review of these statements made by the detective, we conclude that they were not the functional equivalent of interrogation in violation of Pauldo's rights and that the statements were not reasonably likely to elicit an incriminating response, nor should the detective have known that they were reasonably likely to do so.[10] Therefore, the trial court also erred in determining that this

---

[10] We caution that our analysis could have reached the opposite conclusion with the addition of just a few words by the detective, for example,

exchange between the detective and Pauldo demonstrated a failure to honor Pauldo's rights. See *Driver*, 307 Ga. at 646 (2); *Brown*, 287 Ga. at 477 (2).

The dissent appears to concede that the individual requests and statements do not constitute interrogation, but argues that under the totality of the circumstances from Pauldo's perspective, the quick succession of statements, particularly the description of what would happen to Pauldo's clothes at the jail, were not immediately necessary to effectuate an arrest and constituted improper police-initiated discussion of the case. However, because the detective's requests and statements did not constitute interrogation or its functional equivalent, they were not in violation

---

if the detective had prefaced his requests and statements about evidence collection to overtly state that he was asking for the evidence *because* Pauldo had invoked his rights. However, as aptly explained in *United States v. Johnson*, 812 F2d 1329, 1331 (11th Cir. 1986),

> No interest would be served by attempting to list matters that may or may not be discussed by law enforcement officers with an accused in custody after the accused has indicated that a lawyer is desired before further interrogation. It best serves all interests, especially law enforcement, to remain close to the "bright line"; interrogation must cease when an accused in custody requests the presence of a lawyer before further interrogation.

of *Miranda* or *Edwards*.

Moreover, gunshot residue is easily washed away or dissipated, and law enforcement must be afforded the opportunity to conduct gunshot residue tests within a limited period of time after the gun is fired. See *In the Interest of B. S.*, 284 Ga. App. 680, 681 (2) (b) (644 SE2d 527) (2007) (expert testified that gunshot residue can be removed by washing hands, wiping them on clothing, or if the test is performed more than four hours after the gun has been fired). See generally William E. Ringel, *Searches and Seizures, Arrests and Confessions* § 12:9 (2d ed. March 2020 Update) (gunshot residue evidence is viable for only a few hours and can be easily destroyed intentionally or unintentionally by the defendant).[11] Although referencing Pauldo's clothing is a closer question as it is unclear why the detective sought the clothing, it appears that in response to Pauldo's question, the detective was explaining what would be

---

[11] In fact, the police performed a gunshot residue test on Pauldo during the interview they conducted after he signed the waiver-of-rights form, approximately 40 minutes after the detective first asked Pauldo to consent to the test.

obtained by a search warrant if Pauldo chose not to consent to the gunshot residue test. Also, near the end of the interview, Pauldo was asked to change out of his clothing in the interrogation room and deposit his clothes in paper bags for evidence. This process shows that there was an immediate investigative purpose for collecting the clothing before Pauldo was put in jail and that the detective referenced the clothing along with the gunshot residue test to explain what would happen next in the process.

4. In any event, even if we were to assume that the detective's requests and statements were interrogation in violation of *Miranda* and *Edwards*, they did not elicit an incriminating response from Pauldo. After the detective's statements about obtaining a warrant and Pauldo's clothing, Pauldo responded: "Okay, to jail. So, just, . . . I'm being arrested?" and asked what he was being arrested for. In *Walton v. State*, 267 Ga. 713 (482 SE2d 330) (1997), disapproved of on other grounds by *Toomer v. State*, 292 Ga. 49 (734 SE2d 333) (2012), we concluded that the defendant's incriminating statements could be admitted even though the defendant, who had invoked his

right to counsel to law enforcement in another state, was improperly asked by a Georgia detective as he was being transported back to the state whether he wanted to make a statement. Id. at 718 (4). The defendant said no, but asked whether anyone else had given a statement. When the detective replied in the affirmative and also, upon the defendant's request, summarized the statement made by the other witness, the defendant said that was "'basically correct.'" Id. Relying on *Innis*, 446 U. S. at 291, we reasoned that if

> appellant had made an incriminating statement in response to the detective's query whether he wished to make a statement, the prophylactic rule of *Edwards* would have precluded the State's use of the statement. However, appellant's observation that [the witness's] statement, as summarized, was "basically correct," was not given in response to a question posed by one of the detectives, but was appellant's unsolicited comment on the detective's answer to appellant's line of questioning.

*Walton*, 267 Ga. at 718 (4) (citation and emphasis omitted). Based on this reasoning, the *Walton* Court held that the defendant's statement was properly admitted because it was an unforeseeable result of the officer's actions in responding to the appellant's own questions. Id. Therefore, a statement made under such

circumstances is not the product of custodial interrogation.

Similarly, Pauldo's questions about his arrest and his subsequent statements were not in response to the detective's requests to consent to the gunshot residue test or the statements about the search warrant and collecting the clothing. If anything, Pauldo was responding to the detective's statement that Pauldo was going to jail. Thus, because Pauldo's incriminatory statements were not a foreseeable result of the requests and statements made by the detective about collecting evidence, they also cannot be considered the product of custodial interrogation, even if we were to assume that the statements constituted interrogation, and the trial court erred in excluding them on that basis. See *Walton*, 267 Ga. at 718 (4). See also *Brown*, 287 Ga. at 477 (2) (no interrogation where the detective "answered, or deflected, a number of direct questions" from the suspect); *Delay v. State*, 258 Ga. 229, 231 (3) (c) (367 SE2d 806) (1988) (no *Miranda* violation where incriminatory statement was in response to officer's answer to defendant's own question).

5. Although we have concluded that the detective's requests

for consent to a gunshot residue test and statements about getting a search warrant and collecting his clothing at the jail did not violate Pauldo's invocation of his rights, our inquiry does not end there. We must also examine whether Pauldo reinitiated contact with law enforcement authorities and whether, under the totality of the circumstances, Pauldo knowingly, intelligently, and voluntarily waived his rights under *Miranda*, so as to permit further interrogation. See *Driver*, 307 Ga. at 646 (2) (a).

The video recording shows that Pauldo began asking questions about his arrest and the investigation after the detective told Pauldo he was being arrested for homicide, and the detective answered Pauldo's questions. Because law enforcement is permitted to make statements to the defendant about the next steps in the process, such as arrest, and a defendant understandably may ask clarifying questions about his arrest, we do not see this exchange as improper interrogation by the detective or a reinitiation of communication by Pauldo. See *Driver*, 307 Ga. at 650 (2) (b); *Gray v. State*, 304 Ga. 799, 805 (3) (822 SE2d 249) (2018) (suspect's response to an officer's

answer to the suspect's own question is not the product of custodial interrogation); *Brown*, 287 Ga. at 477 (2) (police responses to suspect's questions regarding what he would be charged with and where he would go next are not interrogation); *Bell v. State*, 305 Ga. 707, 710 (3) (827 SE2d 665) (2019) (informing defendant of charges pending against him after he had invoked his right to counsel did not constitute interrogation); *Alvarez v. McNeil*, 346 Fed. Appx. 562, 564 (11th Cir. 2009) ("Informing a person in custody of the charges that he faces is normally attendant to arrest and custody and does not constitute interrogation.").

At that point in the interview, the detective reminded Pauldo that he had invoked his right to remain silent and that he had indicated he wanted his attorney present. Thereafter, the detective did not respond to Pauldo's questions about the case or discuss the case further. Instead, the detective asked Pauldo if he wanted to talk about "the incident," and Pauldo continued to engage with the detective, stating at one point, "I will talk to you, yeah, to benefit me, anything . . . . I don't want to be arrested for homicide."

We find it significant that, despite the reminder that he had invoked his rights, Pauldo continued to ask questions and make statements, explaining that he was willing to waive his rights because he did not want to be arrested. Also, Pauldo's continued efforts to discuss the case made it unclear whether he wished to talk to the detective or not. Therefore, although the detective asked on several occasions whether Pauldo wanted to talk, these attempts to clarify whether Pauldo was invoking his rights were reasonable in light of this ambiguity and "[did] not run afoul of the *Miranda* right to remain silent," nor do they indicate that police failed to scrupulously honor Pauldo's rights. See *United States v. Muhammad*, 196 Fed. Appx. 882, 886 (II) (11th Cir. 2006) (postal inspector did not fail to scrupulously honor suspect's invocation of his right to remain silent by asking questions such as "Do you want to talk to me or not?" after defendant persisted in talking about the case). Moreover, it was only after the detective asked and Pauldo confirmed that he wished to waive his rights and had Pauldo sign the waiver of rights form under the statement that "[Pauldo] has

changed his mind and wishes to talk" that the detective asked Pauldo any questions about the case.

We thus conclude that Pauldo reinitiated contact when he asked questions about why he was being arrested and made statements about the crimes being investigated even after being reminded that he had invoked his rights and that these statements and questions "evinced a willingness and a desire for a generalized discussion about the investigation." *Driver*, 307 Ga. at 650 (2) (b) (citing *Bradshaw*, 462 U. S. at 1045-46) (punctuation omitted). See also *Smith v. State*, 292 Ga. 620, 623 (4) (740 SE2d 158) (2013) (defendant's statement admissible where approximately five minutes after invoking his right to counsel, during which interval investigator completed booking sheet and asked defendant biographical questions, defendant on his own volition and without any prompting, told the investigator he had changed his mind and was willing to talk without an attorney); *Cody v. State*, 324 Ga. App. 815, 823 (1) (752 SE2d 36) (2013) (no violation of defendant's rights where after invoking rights and being informed it would take some

time to get a public defender, defendant said he preferred to "get this over with," and "the detective's statements and actions were permissibly aimed at clarifying Cody's apparent decision to waive the right to counsel and the right to remain silent, and thus proceed with the interrogation without counsel").

Turning to the issue of whether Pauldo knowingly, intelligently, and voluntarily waived his rights, Pauldo was 21 years old at the time of his interview and a junior in college. He stated in the interview that he had conferred with his mother and an attorney and that they had advised him to invoke his rights and not speak to law enforcement because they felt that he was being treated as a suspect. Pauldo became voluble only after learning that he would be arrested for homicide, and he said that he did not want to be arrested and that he wanted to talk to benefit himself. Although only a few minutes elapsed between Pauldo's invocation of his rights and his waiver, the conversation during that interval related to the collection of evidence and answering Pauldo's questions about his arrest. Also, the detective read Pauldo his rights minutes before, at

the start of the interview, and then made sure that Pauldo understood his rights again after Pauldo stated that he wanted to talk. Considering the totality of the circumstances, including Pauldo's age, intelligence, education, his previous consultation with counsel and his mother, his repeated statements that he wanted to talk to avoid being arrested, and the detective's several reminders to Pauldo that he had invoked his rights, we further conclude that Pauldo knowingly, intelligently, and voluntarily waived his rights. Accordingly, we reverse the trial court's grant of Pauldo's motion in limine.

*Judgment reversed. All the Justices concur, except Melton, C. J., and Bethel, J., who dissent.*

MELTON, Chief Justice, dissenting.

After Pauldo was told that he was not being arrested, and after he invoked both his right to remain silent *and* his right to counsel, Detective Knight continued to talk about case-related matters for three minutes, with no break in the conversation, no break in custody, and no change in location, until Pauldo finally relented and

signed a form waiving his previously-invoked rights. Based upon the facts before us in this case, and considering the totality of the circumstances, I disagree with the majority's conclusion that Pauldo initiated further communication with Detective Knight after invoking his right to counsel. And, I further disagree that Pauldo's subsequent waiver of his rights was voluntary. Accordingly, I respectfully dissent.

1. *The Proper Analysis for Right to Counsel.*

The majority conducts an analysis that seems to combine the test for admissibility of a suspect's statements following invocation of the right to remain silent, see *Michigan v. Mosley*, 423 U. S. 96 (96 SCt 321, 46 LE2d 313) (1975) (discussing admissibility of custodial statements obtained after a person invokes their right to remain silent), with the test for admissibility following invocation of the right to counsel, see *Edwards v. Arizona*, 451 U. S. 477 (101 SCt 1880, 68 LE2d 378) (1981) (noting that additional safeguards, beyond those required when a suspect invokes his right to remain

silent, are necessary when a suspect requests counsel).[12] In doing

so, the majority overlooks the higher burden for admissibility

imposed in right-to-counsel cases.[13] Although I would reach the

---

[12] The majority treats the law surrounding these rights as a distinction without a difference. However, this Court has repeatedly recognized and applied the different standards as laid out by the United States Supreme Court in *Mosley* and *Edwards*. See *Bright v. State*, 251 Ga. 440, 445 (2) (306 SE2d 293) (1983) ("We find that the question defendant raises [regarding the violation of his right to remain silent] is controlled by *Michigan v. Mosley, . . .* rather than *Edwards v. Arizona*.") (citations omitted). See also *Morgan v. State*, 275 Ga. 222, 223-224 (564 SE2d 192) (2002) ("Contrary to the argument on appeal, neither the transcript of the *Jackson-Denno* hearing nor the record shows that Morgan ever invoked his right to counsel. Thus, we are not guided by *Edwards*, . . . but by *Michigan v. Mosley*.") (citation and punctuation omitted); *Walton v. State*, 267 Ga. 713, 715 (2) (482 SE2d 330) (1997) (citing *Bright* with approval); *Fields v. State*, 266 Ga. 241, 242 (466 SE2d 202) (1996) ("Fields did not invoke his right to counsel — he simply exercised his right to remain silent. Thus, we are not guided by *Edwards*, but by *Michigan v. Mosley*.")

[13] Compare *Mosley*, supra, with *Edwards*, supra. See also *Arizona v. Roberson*, 486 U. S. 675, 680 (II) (108 SCt 2093, 100 LE2d 704) (1988); *Everett v. Fla. Dept. of Corrections*, 779 F3d 1212, 1240-1241 (11th Cir. 2015) (describing the *Miranda-Mosley-Edwards* progression of case law); *Christopher v. Florida*, 824 F2d 836, 839-840 (11th Cir. 1987) (outlining how *Mosley* refined *Miranda*'s safeguards in right-to-remain-silent cases). As explained by the United States Supreme Court, *Edwards* adds an additional layer of protection for a suspect who invokes his right to counsel by instituting a per se bar to further interrogation in the absence of counsel and raising the standard for a voluntary waiver of this right. *Maryland v. Shatzer*, 559 U. S. 98, 104 (130 SCt 1213, 175 LE2d 1045) (2010). No such "bright-line" rule applies to invoking the right to remain silent. Compare *Edwards*, 451 U. S. at 484-485, with *Mosley*, 423 U. S. at 101-104 & n.10. Under *Mosley* and its progeny, where a suspect's rights *are* scrupulously honored, law enforcement can — under certain circumstances — re-approach the suspect, provide him a new *Miranda* warning, and, upon a valid waiver, conduct a new interrogation.

same conclusion under either analysis, it is the *Edwards* analysis that controls this case and, therefore, the analysis I employ.[14]

Applying the proper standard under *Edwards*, courts first look at whether the right to counsel was invoked. *Edwards*, 451 U. S. at 484. Here, it is undisputed that Pauldo invoked his right to counsel. Consequently, we turn to the second prong of the *Edwards* test, which requires that we examine (a) whether the suspect was responsible for initiating further discussions with the authorities and (b) if the suspect *did* initiate the discussion, whether the suspect knowingly and voluntarily waived his right to counsel. Id. at 484-485. See also *Smith v. Illinois*, 469 U. S. 91, 95 (105 SCt 490, 83

---

See *Mosley*, 423 U. S. at 105-106. *Edwards*, on the other hand, does not allow further police-initiated questioning without the suspect having had the benefit of counsel, unless the suspect re-initiates, see *Edwards*, 451 U. S. at 484-485, creating a presumption of involuntariness for any subsequent waiver of rights that does not arise in a right to remain silent case.

[14] *Edwards* "established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights" in right-to-counsel cases. *Michigan v. Harvey*, 494 U. S. 344, 350 (110 SCt 1176, 108 LE2d 293) (1990). Due to the added layer of protection established by *Edwards* and its progeny, if the two rights are invoked simultaneously — as they were in this case — the *Edwards* analysis must control, because the right to counsel (i.e., the right to remain silent until consulting with counsel) includes and subsumes the right to remain silent. See *Edwards*, 451 U. S. at 482. See also *Roberson,* 486 U. S. at 680.

LE2d 488) (1984).

2. *Initiation.*

"[B]efore a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the suspect himself initiates dialogue with the authorities." (Citation and punctuation omitted.) *Oregon v. Bradshaw*, 462 U. S. 1039, 1044 (103 SCt 2830, 77 LE2d 405) (1983).

> "Initiation" means to "begin' or "set-going"; in the interrogation context, it means that the suspect "started," not simply "continued," the interrogation. . . . [A]ny previous police-initiated interrogation [must] have ended *prior* to the suspect's alleged initiatory remark; for, just as one cannot start an engine that is already running, a suspect cannot "initiate" an on-going interrogation.

(Emphasis in original.) *Christopher*, 824 F2d at 845. See also *United States v. Johnson*, 812 F2d 1329, 1331 (11th Cir. 1986) (no suspect-initiation where law enforcement "engaged . . . in a discussion relating directly and indirectly to the investigation"). Thus, "a suspect has 'initiated' renewed contact with law enforcement authorities, so as to permit further interrogation, only if the renewed contact by the suspect was not the product of past police

interrogation conducted in violation of the suspect's previously-invoked rights." (Citation and punctuation omitted.) *Driver v. State*, 307 Ga. 644, 646 (837 SE2d 802) (2020). "Interrogation" includes express questions, but also "practice[s] that the police should know [are] reasonably likely to evoke an incriminating response." *Rhode Island v. Innis*, 446 U. S. 291, 301 (100 SCt 1682, 64 LE2d 297) (1980).

Furthermore, a suspect's statements or questions to authorities must "evince[ ] a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U. S. at 1045-1046. A "bare inquiry" or those "relating to routine incidents of the custodial relationship" do not constitute initiation. Id. at 1045. See also *Driver*, 307 Ga. at 646 ("[I]nitiation requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand.") (Citation and punctuation omitted.).

The record shows that Pauldo was placed in an interrogation room and, prior to reading Pauldo his *Miranda* rights, the detective

informed Pauldo that he was not being arrested. Thereafter, the detective read Pauldo his rights, and Pauldo invoked both his right to remain silent and his right to counsel. Without skipping a beat, the detective continued to discuss case-related matters, first by requesting consent to conduct a gun residue test, then quickly informing Pauldo the test was to "see if you shot a gun today." Pauldo asked, "Do I have to consent to that?" to which the detective stated, "I'm going to get a search warrant and do it anyway." Pauldo responded with a single word, "Alright."

Next, the detective informed Pauldo that his clothes would be collected for evidence when he arrived at the jail. This statement was how Pauldo learned that he was under arrest, which is evidenced by his statements of "Okay, to jail. So, just . . . I'm being arrested?" and "What am I being arrested for?" The detective replied, "Homicide." Pauldo replied, "Why, I'm saying, why?" The detective stated, "We've talked to a lot of people," and "they put you there; they put you making a threat that you were going to shoot him; they put you there pulling the trigger." At this point — after

outlining the evidence against Pauldo — the detective reminded Pauldo of his right to counsel, saying "You've already told me that you wanted your lawyer here. They told you not to talk to me. Now, if you want to talk to me, that's up to you." Thereafter, Pauldo only asked why he was being arrested, to which the detective continually replied "do you want to talk to me?" until Pauldo agreed to sign a waiver.

While the majority analyzes in isolation each of the detective's statements concerning the gunshot residue test and the collection of Pauldo's clothing to determine if either constituted interrogation, this approach fails to review the *totality of the circumstances* from *the perspective of the suspect*, as is required under the law. See *Driver*, 307 Ga. at 646. See also *Franks v. State*, 268 Ga. 238, 240 (486 SE2d 594) (1997) ("The focus of whether 'interrogation' occurs is primarily upon the perceptions of the suspect and not the intent of the officer, although the officer's intent is relevant. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against

coercive police practices, without regard to objective proof of the underlying intent of the police.") (Citations and punctuation omitted.).

For instance, while, by itself, a request for consent to a gun residue test does not constitute interrogation, see *Everett v. Fla. Dept. of Corrections*, 779 F3d 1212, 1244 (11th Cir. 2015), that single statement made by the detective in this case cannot be looked at in a vacuum. Instead, the record in the case before us shows that the detective made many statements, some of which the majority does not address, relating directly and indirectly to the investigation, in the less than three minutes between Pauldo's invocation of his right to counsel and his sudden desire to waive that right. In other words, it is not any one question that the detective asked, nor whether each of those questions qualifies as interrogation, that answers the question of initiation in the case before us. It is the sum total of the *entire* interaction that drives the analysis.

The record before us shows that, immediately after Pauldo's invocation, *the detective,* not Pauldo, spoke about issues related both

directly and indirectly to the investigation, including: a request for consent to conduct an evidentiary test, obtaining a search warrant if Pauldo did not consent to the test, that Paludo's clothing would be collected as evidence when Pauldo *arrived at the jail*,[15] and an outline of what witnesses told the detective about Pauldo's alleged involvement in the crime.[16]  Pauldo responded to the detective by asking "I'm being arrested?"; "What am I being arrested for?"; and

[15] The majority reasons that this statement was acceptable because there must have been some "immediate investigative purpose" in collecting Pauldo's clothes.  However, as the detective was not actually collecting Pauldo's clothing at that time, this description of future events served no purpose other than to place Pauldo under stress and induce him to talk.  See *Christopher*, 824 F2d at 845 ("[A]ny discussion with the suspect other than that relating to routine incidents of the custodial relationship must be considered a continuation of the interrogation.") (Punctuation omitted.); *State v. Darby*, 284 Ga. 271, 273 (663 SE2d 160) (2008) (police initiated discussion by giving description of suspect's upcoming preliminary hearing).

[16] The record also shows that Pauldo did not volunteer any information about the crime during this short exchange.  See *Taylor v. State*, 303 Ga. 225, 231 (811 SE2d 286) (2018) (suspect initiated discussion when, while smoking a cigarette after her first court appearance, she "spontaneously" told the officer who was watching her details about the crime); *Gray v. State*, 304 Ga. 799, 804 (822 SE2d 249) (2018) (suspect initiated discussion where officer was discussing topics unrelated to the investigation and suspect interrupted that he was being framed for murder).  Nor did he seek case-specific details by asking about the evidence against him, if there were witnesses, or what the detective's theory of the case was.  See *Driver*, 307 Ga. at 647, 650 (suspect initiated discussion where officer prepared to leave after invocation of counsel but suspect called him back to ask if the officer had spoken with any witnesses and if the officer thought it could be self-defense).

"Why, I'm saying, why?" None of these responses can credibly be interpreted as demonstrating a desire to engage in a generalized discussion about the investigation. See *Ashley v. State*, 261 Ga. 488, 489 (1) (405 SE2d 657) (1991) (suspect did not initiate further discussion by asking what he was being charged with). And, while the police can certainly answer questions such as "Why am I being arrested?" with generic responses, the detective's responses were far from generic as he answered Pauldo's questions by discussing case-related matters, *including by outlining the evidence against him*, statements that the majority does not address in its totality-of-the-circumstances analysis. Cf. *State v. Brown*, 287 Ga. 473, 477 (697 SE2d 192) (2010) (officer did not initiate discussion where suspect repeatedly interrupted to ask about the case and officer deflected suspect's questions with generic responses that did not provide any details of the investigation). Indeed, the record shows that Pauldo did not agree to talk about the case, *at all*, until *after* Detective Knight outlined statements from other witnesses implicating Pauldo in the crime. Considering the totality of the circumstances

in the case before us, I cannot conclude that Pauldo was responsible for initiating further conversation with the detective after invoking his right to counsel.[17]

Notably, there are a number of factors which, taken together, demonstrate that the detective, not Pauldo, was the initiator. There was no break in the conversation between Pauldo's invocation and the detective's subsequent discussion of case-related matters. See, e.g., *Driver*, 307 Ga. at 647 (suspect reinitiated conversation where he called detective back into interrogation room to talk about the investigation); *Gray v. State*, 304 Ga. 799, 803 (822 SE2d 249) (2018) (same); *Stewart v. State*, 286 Ga. 669, 671 (690 SE2d 811) (2010) (suspect initiated conversation where he requested to talk about the case four hours after invoking his right to silence). None of the detective's statements were necessary to effectuate an arrest. See *Christopher*, 824 F2d at 845. See also *Smith*, 469 U. S. at 97 & 98

---

[17] To conclude otherwise would condone a post-invocation practice of outlining incriminating evidence to the suspect in an effort to induce him to waive his right to counsel. This is exactly the practice that *Edwards* and its progeny protect against. See *Smith*, 469 U. S. at 98.

n.7 (noting that even finishing the *Miranda* colloquy constitutes "continued police questioning"); *Johnson*, 812 F2d at 1330, 1331 (police initiated post-invocation discussion where agent explained the criminal process, including appearing before a magistrate, bond, and appointment of a public defender); *State v. Darby*, 284 Ga. 271, 273 (663 SE2d 160) (2008) (police initiated discussion of case by outlining what would happen at suspect's upcoming preliminary hearing). Likewise, contrary to the majority's assertion, none of the statements made by the detective fit into the narrow, so-called "booking exception" of *Miranda*. See *Franks v. State*, 268 Ga. at 239 (noting that the Georgia courts have limited the "booking exception" "to requests for basic biographical data, such as the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form"). Nor did the detective ask "clarifying" questions to determine if Pauldo had invoked his right to counsel, as the record shows Detective Knight acknowledged that Pauldo "already told me you wanted your lawyer here." See *Christopher*, 824 F2d at 841-842 (explaining that post-

invocation "clarifying" questions by officer may be appropriate where an invocation of rights is ambiguous or equivocal).

Based on the foregoing, and after reviewing the *entire* exchange from *Pauldo's* perspective, I cannot say that the interrogation ceased, let alone was reinitiated by Pauldo. See *Johnson*, 812 F2d at 1331. Instead, the entire colloquy all served one purpose — to badger Pauldo into waiving his right to counsel. See *Michigan v. Harvey*, 494 U. S. 344, 350 (110 SCt 1176, 108 LE2d 293) (1990).

3. *Waiver.*

The facts presented to us in this case show why the distinction between a right-to-silence analysis and a right-to-counsel analysis matters. Although the majority conducts a waiver analysis under the traditional standard, such analysis is not sufficient in a right-to-counsel case. "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Arizona v. Roberson*, 486 U. S. 675, 680 (108 SCt 2093, 100 LE2d 704) (1988) (quoting *Miranda,* 384 U. S. at 475).

The traditional standard for waiver outlined in *Johnson v. Zerbst*, 304 U. S. 458 (58 SCt 1019, 82 LE 1461) (1938), governs a waiver analysis in a right-to-silence case, but "[i]n *Edwards*, the Court determined that *Zerbst*'s traditional standard for waiver was not sufficient to protect a suspect's right to have counsel present at a subsequent interrogation if he had previously requested counsel; 'additional safeguards' were necessary." *Shatzer*, 559 U. S. at 104 (citation omitted). Consequently, *Edwards* established a presumption that, after a suspect invokes his right to counsel, any subsequent waiver of that right is involuntary. Id. at 111 n.7. In a close case, such as this one, the State fails to meet its heavy burden to show that Pauldo's waiver was indeed voluntary.

As explained in *Shatzer*,

[t]he rationale of *Edwards* is that once a suspect indicates that he is not capable of undergoing custodial questioning without advice of counsel, any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures [of custody] and not the purely voluntary choice of the suspect. Under this rule, a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right

> to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel.

(Citation and punctuation omitted.) *Shatzer*, 559 U. S. at 104-105. See also id. at 108-109 ("The only logical endpoint of *Edwards* disability is termination of *Miranda* custody and any of its lingering effects.").

The United States Supreme Court has held that this presumption of involuntariness can be overcome. See *Shatzer*, 559 U. S. at 106. However, when a suspect is held in uninterrupted custody without an opportunity to "regain[ ] a sense of control or normalcy," merely administering new *Miranda* warnings before engaging in another interrogation of the suspect is insufficient to establish voluntary waiver of the suspect's right to counsel. Id. at 107, 116. This rule keeps "authorities[,] through 'badgering' or 'overreaching' — explicit or subtle, deliberate or unintentional — [from] wear[ing] down the accused and persuad[ing] him to incriminate himself notwithstanding his earlier request for counsel's assistance." (Citation and punctuation omitted.) *Smith*, 469 U. S. at

98.

In conducting the waiver analysis, we "review whether any actual renewal of contact by the suspect, in the context of the entire interaction between law enforcement authorities and the accused, constitutes a *legally effective* initiation." (Punctuation omitted; emphasis supplied.) *Mack v. State*, 296 Ga. 239, 248-249 (765 SE2d 896) (2014). In doing so, once again, we look at "the entire sequence of events leading up to the suspect's renewal of contact," including any lapse of time between a previous interrogation and the suspect's renewed contact, "any change in location or in the identity of the officers involved from one interview to the next, and any break in custody between interviews." (Citations omitted.) Id. at 248. See also *Everett*, 779 F3d at 1241 ("One, but not the only, measure of the voluntariness of a defendant-initiated confession is the measure of whether a sufficient period of time has elapsed since the termination of police questioning for the defendant to have rationally reflected on the choice before him.") (Citation and punctuation omitted.). Likewise, "we have recognized that substance trumps form in

determining whether the entire sequence of events indicates a defendant's voluntary initiation of renewed contact." *Mack*, 296 Ga. at 247.

Applying these waiver principles to the facts of this case, it is clear that the State has failed to meet its heavy burden of overcoming the presumptive involuntariness of Pauldo's waiver. The entire exchange between the detective and Pauldo — from invocation to waiver — was conducted by the *same officer*, with *no break in custody*, *no change in location*, and lasted *less than three minutes*. Once again, the majority fails to address, let alone consider *any* of these issues in its waiver analysis. Furthermore, Pauldo did not waive his rights after "further deliberation in familiar surroundings [that] caused him to believe (rightly or wrongly) that cooperating with the investigation [was] in his interest." *Shatzer*, 559 U. S. at 108. With no break in custody, Pauldo waived his rights in response to Detective Knight discussing the evidence implicating him in the crimes and the detective's *repeated* and *persistent* question of "do you want to talk to me?" Thus, Pauldo's waiver was

not the product of deliberative choice. It came at the detective's behest, and not at Pauldo's own instigation. See *Johnson*, 812 F2d at 1331. Regardless of what the detective intended, the entire interaction served as just the type of subtle badgering that *Edwards* was designed to combat. See *Roberson*, 486 U. S. at 681. Based on the foregoing, I respectfully dissent.

I am authorized to state that Justice Bethel joins in this dissent.

DECIDED JUNE 16, 2020.
Murder. Laurens Superior Court. Before Judge Green.
*L. Craig Fraser, District Attorney, Cheryl B. Hightower, Robert B. Faircloth, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.
*Nicole Fegan; Ryan C. Locke*, for appellee.