304 Ga. 799
FINAL COPY

S18A1583. GRAY v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Bobby Eugene Gray appeals his convictions for murder and related crimes, contending that the evidence was insufficient to support the verdict, the verdict was contrary to and against the weight of the evidence, and that the trial court and defense counsel made certain evidentiary errors.[1] For the reasons set forth below, we affirm.

---

[1] On March 5, 2003, Gray and James Stewart Odom were indicted for murder, felony murder, two counts of aggravated assault, armed robbery, and possession of a weapon during the commission of a crime. Odom was found guilty of these crimes in a separate trial on September 12, 2003. Following a March 8-12, 2004 jury trial, Gray was also convicted of all counts charged against him. On March 19, 2004, Gray received a life sentence for malice murder, ten years for armed robbery to run consecutively to the life sentence, and five years for possession of a weapon during the commission of a crime to run consecutively with the life sentence and the armed robbery sentence. The trial court merged the first aggravated assault count into the malice murder count, and the second aggravated assault count into the armed robbery count for sentencing purposes, and although the trial court also purported to "merge" the felony murder count into the malice murder count, the felony murder count was actually vacated by operation of law. See Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993). On October 15, 2013, Gray filed a "Petition for

1. In the light most favorable to the verdict, the record shows that, on November 9, 2001, James Stewart Odom picked Gray up from a friend's house, and the two men drove around drinking and smoking crack cocaine. Over the course of the night, Odom and Gray made several drug purchases, which Odom paid for because Gray did not have any money at the time. At one point, Odom and Gray went to a body shop where Gray worked so that Gray could get money for another drug transaction. Gray spoke with someone inside the shop and then

Redress," and the trial court granted an out-of-time appeal on January 26, 2014, directing the appeal to be filed within 30 days. No timely notice of appeal or motion for new trial was filed. On May 22, 2014, the trial court granted Gray an extension until July 31, 2014, even though it was not authorized to do so. See OCGA § 5-6-39. On July 31, 2014, Gray filed a motion for new trial, which was amended on August 3, 2015. The trial court denied Gray's motion for new trial on August 3, 2015, and Gray subsequently filed an untimely notice of appeal with this Court on March 22, 2016. On May 9, 2016, this Court dismissed the appeal for lack of jurisdiction, stating that, "an untimely motion for new trial does not toll the time for filing the notice of appeal." Case No. S16A1270 (citing Fulton v. State, 277 Ga. 126 (587 SE2d 20) (2003)). The Court's order also provided that

> [Gray] may file another request for an out-of-time appeal in the trial
> court. If the trial court grants an out-of-time appeal, [Gray] will
> have 30 days from the entry of the trial court's order within which
> to file a notice of appeal.

On June 14, 2018, Gray filed a request for an out-of-time appeal with the trial court, and the trial court granted the appeal on the same day. Gray then filed this timely notice of appeal on July 6, 2018. See Rowland v. State, 264 Ga. 872, 875 (2) (452 SE2d 756) (1995). The appeal was docketed in this Court for the August 2018 term and submitted for decision on the briefs.

told Odom to call the drug dealer and set up another purchase. However, when Odom and Gray later met the drug dealer, Gray admitted that he would not actually have money until the next day, so Odom paid for the drugs again. Still looking for more money to fund drug transactions, Odom suggested that they ask an acquaintance, Buford Evans, for cash. Around 6:30 a.m., Gray and Odom drove to Evans's house, and Evans invited them in and agreed to lend them twenty dollars. Odom testified that Evans had additional money, which Evans put back in his pocket after handing Odom and Gray the twenty dollars. When Gray and Odom got in the car to leave Evans's home, Gray stated that he forgot his cigarettes and ran inside to get them. After not hearing from Gray for a few minutes, Odom went into the house and found Evans with his back to the wall and his hands up, and Gray with a knife raised toward Evans. Although Odom testified that he did not see Gray stab Evans, he did testify that he saw cuts above Evans's right eye and blood coming from his head. Odom further testified that he was "freaking out" and trying to get Gray to put down the knife. At one point, Odom cut his own hand while grabbing Gray's arm in an attempt to get him to put down the knife. Odom then sat Evans down on the floor and tried to call 911, but Gray pulled out a gun and pointed the gun at Odom and Evans

3

while yelling at Odom to leave. At this point, Odom attempted to help Evans back up on the couch, but Gray grabbed Odom by his collar to get up and leave, making Odom fall on top of Evans. Instead of leaving, Odom propped up Evans on the couch and went to the kitchen to find something to help clean up Evans's blood. When Odom returned with a rag, Gray told him to wipe up any of his bloody fingerprints, like he had just done himself.[2] Odom later saw Gray taking Evans's checkbook and wallet from the coffee table in the living room. The two men then left the house with Gray pointing a gun at Odom, and left Evans in the living room still bleeding. Odom testified that, although he did not see any stab wounds on Evans, he saw a puddle of blood on the floor in the foyer, and a puddle of blood near Evans's body when Gray pushed Odom on top of Evans. While driving away from Evans's house, Gray disposed of the gun, the knife, and Evans's belongings in a dumpster. Gray and Odom then used the money they stole from Evans to purchase more drugs. After smoking the drugs, Gray and Odom drove to the body shop they visited earlier and disposed of their clothes in a barrel behind the shop.

---

[2] Gray's fingerprint was later found on a bloodstained trophy in Evans's house.

Evidence collected and observed by law enforcement supported this version of events. On November 13, 2001, Officer Paul Garland was dispatched to Evans's house, where he found Evans's dead body, covered in blood and slumped over on the couch. Evans had lacerations to his head and stab wounds on his chest. The GBI medical examiner confirmed Evans's cause of death was from one of two stab wounds to the chest, inflicted by a cutting instrument like a knife going at least "two to three inches" into Evans's heart.[3] He also testified that Evans suffered blunt force injuries and abrasions on the top part of his head consistent with being hit or pushed against something about seven to nine times.[4] In addition, evidence of the following was found in the house: Evans's pants on the living room floor with the pockets turned inside out; pooled blood and blood spatter throughout the living room; dried blood and athletic shoe footprints on the kitchen floor and blood on the sink; and two trophies with bloodstains on the hardwood floor near the front door. Gray's fingerprint was

---

[3] The GBI examiner also testified that this type of wound could take several minutes to kill someone after the victim is stabbed.

[4] The GBI examiner also testified that the marble base of a trophy, if used to inflict blunt force trauma, would cause the same type of abrasions found on Evans's head.

found on one of the trophies along with Evans's blood.

On November 14, 2001, Gray was placed under arrest at the Clayton County Police Department. Gray signed a waiver of rights form two separate times and engaged in two interviews with Detective Michael Harris that took place less than an hour apart. During the second interview, Gray confessed that he was with Odom on the night of the murder, that he and Odom had discussed wanting money from Evans at some point during the night, and that he went into Evans's house and picked up the trophy while inside.

Gray contends that there was insufficient evidence to convict him of the crimes for which he was found guilty. We disagree. The evidence presented at trial was sufficient to enable the jury to find Gray guilty beyond a reasonable doubt of the crimes for which he was convicted.[5] Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-21 (party to a crime).

---

[5] We note that, because the trial court vacated the felony murder count and merged both counts of aggravated assault, those counts do not amount to actual "convictions." Slack v. State, 288 Ga. 659, 661 (2) (706 SE2d 447) (2011) (jury verdicts on individual counts that are merged into other counts for sentencing purposes are not equivalent to convictions).

2. Gray contends that the evidence was sufficiently close to warrant this Court to exercise discretion pursuant to the general grounds set forth in OCGA §§ 5-5-20 and 5-5-21 and grant Gray a new trial. We disagree.

As this Court has previously explained,

> [a] motion for new trial based on OCGA § 5-5-20, i.e., that the verdict is contrary to the evidence, addresses itself only to the discretion of the trial judge. Whether to grant a new trial based on OCGA § 5-5-21, i.e., that the verdict is strongly against the evidence, is one that is solely in the discretion of the trial court, and the appellate courts do not have the same discretion to order new trials.

(Citation and punctuation omitted.) Dent v. State, 303 Ga. 110, 114 (2) (810 SE2d 527) (2018). Consequently, when this Court reviews a trial court's denial of a new trial based upon the general grounds, "this Court must review the case under the standard set forth in Jackson v. Virginia, supra." (Citation and punctuation omitted.) Id. As this Court determined in Division 1, supra, that standard has been met.

3. Gray contends that the trial court erred in failing to suppress his in-custody statements to law enforcement on November 14, 2001. Specifically, Gray argues that, because Detective James Walker violated his rights by having a conversation with him after he told Detective Harris that he did not wish to

speak any longer, his ensuing statements should be suppressed. We disagree.

The United States Supreme Court has held that when an individual in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," and "any statement taken after the person invokes his privilege cannot be other than the product of compulsion." Miranda v. Arizona, 384 U. S. 436, 473-474 (III) (86 SCt 1602, 16 LE2d 694) (1966). However, "[i]f, after invoking his Fifth Amendment rights, a defendant is found to have initiated contact with authorities and then knowingly and intelligently waived his rights, his ensuing statements will be considered properly obtained." Mack v. State, 296 Ga. 239, 244 (2) (765 SE2d 896) (2014), citing Oregon v. Bradshaw, 462 U. S. 1039, 1045 (103 SCt 2830, 77 LE2d 405) (1983) (plurality opinion).

Testimony at the Jackson-Denno hearing showed that, when Gray was brought into the station, Detective Walker sat with him until Detective Harris was available. At that point, Detective Harris began the interview with Gray without Detective Walker in the room.[6] Detective Harris first asked Gray about

---

[6] It is not disputed that Gray was not in custody when he was first brought into the station.

the night of the murder, and Gray denied knowing Evans, hanging out with Odom, or being at Evans's house. Detective Harris then read Gray his Miranda warnings, and Gray stated that he understood his rights and was still willing to talk.[7] Detective Harris asked Gray the same questions again, and Gray gave the same responses. However, when Detective Harris told Gray that his fingerprint was found on a trophy collected from Evans's house, Gray eventually claimed that he was with Odom on the night of the murder, but that he dozed off in Odom's car and woke up to Odom handing him the trophy. At this point, Detective Harris placed Gray under arrest, and Gray indicated that he no longer wished to talk. Detective Harris subsequently left the interview room, and sent Detective Walker[8] in to watch over Gray.[9] Detective Walker spoke with Gray about non-case-related topics, including where Gray was currently living and about his dog. During their conversation, without any prompting from Detective

---

[7] It is not disputed that Gray validly waived his Miranda rights during the first interview with Detective Harris.

[8] Detective Walker testified at the Jackson-Denno hearing that he went back into the interview room because Gray had requested to speak with him. Gray and Detective Walker had known each other for over twenty years. He also testified that he went back into the room because Detective Harris sent him to watch over or "babysit" Gray.

[9] Detective Harris noticed blood on Gray's clothes during their initial conversation, and sent the ID technician and photographer into the room along with Detective Walker.

Walker, Gray stated that he was being "framed" for murder. Detective Walker then asked Gray if that is why he was there, to which Gray responded, "yes." Then, after Gray's third comment about being framed for murder, Gray also volunteered to Detective Walker that Detective Harris had previously indicated that his fingerprint was found on a trophy in Evans's home. At this point, Detective Walker said that if Detective Harris told Gray that information, that it was not a lie, and he suggested that if Gray knew any information that might help him, he should speak with Detective Harris. Gray then requested to speak with Detective Harris again. Detective Harris re-entered the room and read Gray his Miranda rights for the second time. After waiving his rights again, Gray admitted that he was with Odom on the night of the murder, that he and Odom discussed wanting money from Evans at some point during the night, and that he went into Evans's house and picked up the trophy while inside. Gray contends that these statements were not admissible because he had invoked his right to silence, and he had not voluntarily initiated renewed questioning.

"On appeal, the reviewing court must accept the trial court's findings of disputed fact regarding 'initiation' unless clearly erroneous." Mack, supra, 296 Ga. at 248 (2) (b). However, we must also independently review "whether any actual renewal of contact by the suspect, in the context of the entire interaction

10

between law enforcement authorities and the accused, constitutes a legally effective 'initiation.'" Id. at 248-249 (2) (b).

Here, Gray's right to remain silent was not violated. First, it is not in dispute that Detective Harris "scrupulously honored [Gray's] . . . invocation of his right to remain silent by immediately stopping his interview and physically exiting the interview room." Griffin v. State, 280 Ga. 683, 686 (2) (631 SE2d 671) (2006). See also Michigan v. Mosley, 423 U. S. 96, 104 (96 SCt 321, 46 LE2d 313) (1975) (confessions are unconstitutionally coerced from a defendant when the accused's right to cut off questioning was not scrupulously honored after he or she decided to remain silent). See generally Miranda, supra, 384 U. S. at 457-458 (I). Detective Walker's subsequent initial conversation with Gray about non-case-related matters did not constitute "express questioning by law enforcement officers or its functional equivalent," and thus was not an improper interrogation. (Citation and punctuation omitted.) State v. Brown, 287 Ga. 473, 476 (2) (697 SE2d 192) (2010). See also Taylor v. State, 303 Ga. 225, 231 (5) (811 SE2d 286) (2018) (there was no interrogation where the officer told a defendant, who had invoked her right to remain silent, that if she ate something she could smoke a cigarette outside, and she subsequently made spontaneous confessions about the case while outside with the officer, because the officer's

11

actions were "not calculated to elicit an incriminating response").

Further, to the extent that Detective Walker's later responses to Gray's comments about being framed and his fingerprint being on the trophy could be characterized as an interrogation, Gray initiated the renewed contact by "speak[ing] up first" and thereby "reflect[ing] a desire to discuss the investigation at hand." Mack, supra, 296 Ga. at 246 (2) (b). See also Brown, supra, 287 Ga. at 477 (2) (defendant repeatedly initiated conversation, unprompted by an interrogation posture, when he continually interrupted detectives to discuss case-related topics, including his concern for the victim). See also Bradshaw, supra, 462 U. S. at 1045 (plurality opinion) (distinguishing between inquiries "relating to routine incidents of the custodial relationship" that did not meet the standard for initiation, and those "represent[ing] a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation"). Here, Gray made three unsolicited comments to Detective Walker about being framed. And Detective Walker responded by asking Gray if that is why he was there only *after* Gray brought up the case first. Walton v. State, 267 Ga. 713, 718 (4) (482 SE2d 330) (1997) ("[A]n accused's response to an officer's answer to a question posed by the accused is not the product of custodial interrogation."), disapproved on other

12

grounds by <u>Toomer v. State</u>, 292 Ga. 49 (734 SE2d 333) (2012). After Gray requested to speak with Detective Harris again, Detective Harris re-read Gray his <u>Miranda</u> rights, and Gray re-signed the <u>Miranda</u> form, validly waiving his rights. Thus, Gray's subsequent admissions to Detective Harris were properly obtained and admissible in trial. There was no error.

<u>Judgment affirmed. All the Justices concur</u>.

Decided December 10, 2018.

Murder. Clayton Superior Court. Before Judge Carter.

Darrell B. Reynolds, Sr., for appellant.

Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Todd E. Naugle, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.