NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 3, 2026

S25A1087.  THE STATE v. LEE.

COLVIN, Justice.

Michael Donnell Lee has been charged with murder and related offenses in connection with the shooting death of Aaron James Grant.[1] The record indicates that Lee was arrested shortly after the shooting, which occurred around 2:15 in the morning on June 15, 2022. Several hours later, he made incriminating statements to Detective Charles Sendling during a custodial interrogation at the Atlanta Police Department. The State filed a pretrial motion in limine, seeking to admit Lee's incriminating statements in its case-in-chief. But the trial court denied that

---

[1] On September 12, 2022, a Fulton County grand jury returned an indictment against Lee, charging him with malice murder (Count 1), felony murder (Counts 2 and 3), aggravated assault with a deadly weapon (Count 4), possession of a firearm during the commission of a felony (Count 5), and possession of a firearm by a convicted felon (Count 6).

motion. As relevant here, the trial court ruled that Lee's statements were inadmissible under *Miranda v. Arizona*, 384 US 436 (1966), and *Edwards v. Arizona*, 451 US 477 (1981), because Lee had invoked his constitutional rights to counsel and to remain silent and did not reinitiate communication with Detective Sendling before the detective interrogated him. And the trial court ruled that Lee's statements were also inadmissible as a matter of due process because they were involuntary. The State filed this interlocutory appeal challenging the trial court's suppression of Lee's statements.[2] As explained below, we affirm the trial court's suppression of Lee's statements under *Miranda* and *Edwards*, but we reverse the trial court's suppression of Lee's statements under due process principles.

1. During a hearing on the State's motion in limine, the State admitted into evidence a video recording of Lee's custodial

---

[2] See OCGA § 5-7-1(a)(4) (granting the State a right to appeal "[f]rom an order, decision, or judgment suppressing or excluding evidence illegally seized … in the case of motions made and ruled upon prior to the impaneling of a jury or the defendant being put in jeopardy, whichever occurs first").

2

interview. As relevant here, the recording showed the following. Detective Sendling asked Lee several questions about Lee's education level and fluency with the English language, in response to which Lee indicated that he had a third-grade education, that he could understand and speak the English language but could not write in English, and that he would understand something if the detective read it to him. Detective Sendling proceeded to read Lee his *Miranda* rights, and Lee confirmed that he understood those rights. Detective Sendling then asked if Lee "wish[ed] to speak with [him] at this time without a lawyer," and Lee responded in the negative. Seeking clarification, the detective asked, "So you don't want to talk?" And Lee answered again in the negative. The detective then acknowledged Lee's answer, saying, "OK."

Lee then asked Detective Sendling what he was charged with. After responding that Lee was "going to be charged with murder and aggravated assault," the detective got up from his chair, said he would come back after doing some paperwork, and asked Lee if he wanted anything to drink. Lee responded that he wanted some chips

and a Gatorade, and the detective then left the room.

A few minutes later, Detective Sendling returned to the interview room and gave Lee a bag of chips and a Gatorade. At that point, Lee said, "Hey," Detective Sendling responded, "Yes, sir," and Lee asked, "Why am I charged with murder, man?" In response, Detective Sendling asked, "Why are you charged with murder? Why do you think?" Before giving Lee a chance to respond, Detective Sendling said, "Remember you don't want to talk to me, so." Lee and Detective Sendling then stared at each other for several seconds before Detective Sendling asked again, "So why do you think you were charged?" Lee remained silent for several more seconds, and Detective Sendling then turned and moved toward the door while saying, "If you tell me you want to talk to me, I'll talk to you." But before the detective exited through the open door, Lee responded, "Let's talk, man." Detective Sendling then asked, "You want to talk?" And Lee responded, "Yeah." Detective Sendling then briefly left the room before returning with a notepad and asking Lee, "What do you want to talk about?" When Lee, who was eating chips, did not

promptly respond, Detective Sendling asked, "How did your lip get busted?" Lee responded that he fell. The detective then asked Lee a series of questions about the crime, which elicited several incriminating statements over the course of an interview that lasted less than 20 minutes.

2. On appeal, the State does not dispute the trial court's determination that Lee invoked his constitutional rights to counsel and to silence, and that Detective Sendling was therefore required to scrupulously honor Lee's invocation by ceasing the interrogation. The State argues only that the trial court erred in concluding that Lee did not reinitiate communication with the detective by asking why he was charged with murder. We review that ruling de novo because the controlling facts here, which were ascertainable from the recording of the interview alone, are undisputed, and we review de novo the trial court's application of the law to those facts.[3] See,

---

[3] Although Detective Sendling testified about how the interview unfolded, his testimony was consistent with the recording, and there is no dispute about the sequence of events or what words were said during the interview. Further, the trial court did not make any credibility findings about

5

e.g., *State v. Leverette*, 320 Ga. 806, 809–10 (2025); *Quintanar v. State*, 322 Ga. 61, 65–66 (2025). As explained below, we conclude that the trial court's determination was not erroneous.

Pursuant to the United States Supreme Court's decision in *Miranda*, a defendant who is in custody "must be warned prior to any questioning" that he has certain rights, including "the right to remain silent" and "the right to the presence of an attorney." *State v. Tripp*, 320 Ga. 536, 548 (2024) (quoting *Miranda*, 384 US at 479). "To use a defendant's custodial statements in its case-in-chief, the State must prove by a preponderance of the evidence," based on "the totality of the circumstances surrounding the interrogation," that "the defendant was advised of these rights and that he voluntarily, knowingly, and intelligently waived them." Id. (quotation marks omitted).

In *Edwards*, the United States Supreme Court established "a

---

Detective Sendling's testimony or appear to rely in any way on his testimony when describing how the interview unfolded or when ruling on the *Miranda* issue. Instead, the court relied on and described what "the video recording of the interview" showed.

prophylactic rule, designed to protect an accused in police custody from being badgered by police officers" after invoking his *Miranda* rights. *State v. Pauldo*, 309 Ga. 130, 133 (2020) (quotation marks omitted). As we have explained, pursuant to *Edwards*, if "a suspect invokes the right to silence or the right to counsel, or both," "police must scrupulously honor the suspect's right[s]," meaning at a minimum that the police "may not … subject[ ] [the suspect] to further questioning" that "the police should know [is] reasonably likely to elicit an incriminating response." Id. at 133–34 (cleaned up). But if "the suspect initiates the conversation regarding his case, no violation of the *Edwards* rule occurs." Id.

"In examining the concept of 'initiation' under *Edwards*," the United States Supreme Court has "distinguished between inquiries 'relating to routine incidents of the custodial relationship,' such as a request for a drink of water, and those 'representing a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.'" *Mack v. State*, 296 Ga. 239, 246 (2014) (punctuation omitted) (quoting *Oregon v. Bradshaw*,

462 US 1039, 1045 (1983) (plurality opinion)). Thus, "initiation" requires "not only that the defendant speak up first" after having previously invoked his rights, "but also that his words reflect" a "willingness and a desire for a generalized discussion about the investigation." *Pauldo*, 309 Ga. at 135, 144 (quotation marks omitted). See *Mack*, 296 Ga. at 246 ("'[I]nitiation' requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand.").

(a) On appeal, the State argues that Detective Sendling's interrogation of Lee was permissible under *Edwards* because, after invoking his *Miranda* rights, Lee reinitiated communication with the detective. Specifically, the State contends that Lee reinitiated communication because, after asking the detective "what" he was being charged with and being informed that he was charged with murder, Lee asked the detective "why" he was being charged with that crime.

To support its argument, the State relies on our decision in *Pauldo*. But the State's reliance on that case is misplaced. The

State's confusion about *Pauldo* appears to stem from the fact that, in that case, we considered two separate parts of an interaction that each included a question from the defendant about "why" he was being arrested. See *Pauldo*, 309 Ga. at 132, 143–44. The State focuses on the latter part of the exchange, which we held *did* reinitiate communication. See id. at 143–44. But, as explained below, the interaction at issue here is similar to the first part of the interaction we addressed in *Pauldo*, which we held did *not* reinitiate communication. See id. at 143.

In *Pauldo*, we explained that "initiation," under *Edwards*, requires that a defendant "speak up first" with "words [that] reflect a desire to discuss the investigation at hand." *Pauldo*, 309 Ga. at 135 (quotation marks omitted). And we contrasted "clarifying questions about [one's] arrest," which merely seek information from officers, with words showing that the defendant in fact has "a willingness and a desire" to engage in "a generalized discussion about the investigation." Id. at 143–44 (quotation marks omitted).

Turning to the facts of the case, *Pauldo* explained that, after

9

the defendant invoked his right to remain silent and the detective had a brief exchange with the defendant about doing a "gun residue" test and taking the defendant's clothes, two parts of an interaction occurred in sequence. *Pauldo*, 309 Ga. at 131–32, 143–44. And we separately analyzed whether the defendant had reinitiated communication during each part of the interaction. See id. at 143–44.

> *Pauldo* described the first part of the interaction as follows:
>
> [The defendant] asked again whether he was being arrested, and the detective confirmed that he was, despite having told [the defendant] minutes before that he was not being arrested. After [the defendant] asked what he was being arrested for, the detective responded, "Homicide." [The defendant] asked why, and the detective explained that they had talked to "a lot of people," and they had identified him as the shooter.

*Pauldo*, 309 Ga. at 132. We concluded that this part of the interaction did not constitute "a reinitiation of communication by [the defendant]" because, in asking "what" he was being arrested for and "why" he was being arrested for that crime, the defendant was merely "ask[ing] clarifying questions about his arrest" to obtain

10

information from the officer, not "evinc[ing] a willingness and a desire" to engage in "a generalized discussion about the investigation." Id. at 132, 143–44 (quotation marks omitted).

We then turned to a second part of the interaction, which immediately followed the first, describing it as follows:

> [The defendant] then started talking again, saying, "Sir," but the detective interrupted to say: "You've already told me that you wanted your lawyer here. They told you not to talk to me. Now, if you want to talk to me, that's up to you." [The defendant] replied that he did not understand why he was being arrested and that he "did not do this," asking again, "Why am I being arrested?" In response, the detective asked, "Ray, do you want to talk to me?" [The defendant] replied, "I mean, I will talk to you. I'm sitting here; I'm talking to you now. I'm telling you, like, why …." The detective again interjected, "Do you want to talk to me about this incident?" [The defendant] replied, "I will talk to you about this incident, sir[,]" first stating that he was not there, then correcting himself to say that he was there, but asserting that he was not responsible for the shooting. [The defendant] then asked the detective, "What [do] you want to know?"
>
> At that point, the detective stated that if [the defendant] wanted to talk to the detective, he needed to sign the waiver-of-rights form. The detective again asked [the defendant], "So you're changing your mind, and you want to talk to me?" [The defendant] replied, "I will talk to you, yeah, to benefit me, anything …. I don't want to be arrested for homicide."

11

*Pauldo*, 309 Ga. at 132. We concluded that this part of the interaction, by contrast with the first, "reinitiated contact." Id. at 144. As we explained, this was because, by "ma[king] statements about the crimes being investigated" (including that "he did not understand why he was being arrested" and that "he did not do this") and asking again "why he was being arrested" — "even after being reminded that he had invoked his rights" — the defendant had "evinced a willingness and a desire for a generalized discussion about the investigation." Id. at 132, 144 (quotation marks omitted). We further noted that the detective had "scrupulously honor[ed]" the defendant's rights because, in response to the defendant's "continued efforts to discuss the case [that] made it unclear whether he wished to talk to the detective or not," the detective did not interrogate the defendant about the crime but only made "reasonable" "attempts to clarify" the "ambiguity" by asking the defendant "if he wanted to talk." Id. at 143–44. And we "f[ound] it significant" that, after being asked for clarification about whether

he wanted to talk about "the incident," the defendant explained that he was willing to do so "because he did not want to be arrested." Id. at 143.

Here, Lee's interaction with Detective Sendling was similar to the first part of the interaction in *Pauldo* discussed above, which we held did not reinitiate communication. See *Pauldo*, 309 Ga. at 143. Just as the defendant in *Pauldo* asked "what" he was being arrested for and "why," Lee asked "what" he was being charged with and "why." Id. at 132, 143. As we explained in *Pauldo*, inquiries like these are merely "clarifying questions about [one's] arrest" that seek information from an officer. Id. at 143. Such questions, standing alone, do not "evince[ ]" a defendant's "willingness" and "desire" to participate in "a generalized discussion about the investigation." Id. at 143–44 (quotation marks omitted). And here, nothing about the context in which Lee asked "what" he was charged with and "why" created any ambiguity about whether he was signaling a new desire

to personally "discuss the investigation at hand."[4] Id. at 135. Lee did not express any desire to discuss "the incident" for his own benefit or claim that he did not "do this [crime]" — statements that, in the second part of the interaction at issue in *Pauldo*, indicated a willingness to have "a generalized discussion about the investigation." Id. at 132, 143–44 (quotation marks omitted). Indeed, Lee did not say anything at all after asking "what" he was charged with and "why." Thus, as *Pauldo* makes clear, Lee's "clarifying questions about [his] arrest," which showed only that he wished for the detective to provide him information, did not constitute "a reinitiation of communication" or create any "ambiguity" about whether he wanted to participate in a more generalized discussion of the investigation. Id. at 143–44. Accordingly, the State's argument on appeal as to why the trial court erred in concluding

---

[4] Although the dissenting opinion emphasizes that Lee caught Detective Sendling's attention by saying, "Hey," before Lee asked "why" he was charged, the dissenting opinion does not explain why the word "Hey" or the act of catching the detective's attention showed that Lee had a desire to engage in a generalized discussion of the investigation, as opposed to a desire to ask a clarifying question about his arrest.

that Lee did not reinitiate communication fails.[5]

(b) Advancing an argument on behalf of the State that the

State does not itself raise, the dissenting opinion appears to argue

---

[5] The dissenting opinion does not argue that we should overrule our decision in *Pauldo*, which, as described above, held on analogous facts that a defendant did not reinitiate communication simply by asking "what" he was arrested for and "why." Compare *Pauldo*, 309 Ga. at 132, 143 (holding that the defendant's questions about "what" he was being arrested for and "why" he was being arrested for that crime did not reinitiate communication, where, at that point in the interaction, there was no other evidence that the defendant was expressing a desire to engage in a generalized discussion about the investigation), with id. at 144 (holding that, in a later interaction, the defendant "reinitiated contact when he asked questions about why he was being arrested *and made statements about the crimes being investigated even after being reminded that he had invoked his rights*" (emphasis added)). Instead, the dissenting opinion attempts to distinguish *Pauldo*. Specifically, the dissenting opinion appears to argue that, in context, Lee's question about "why" he was charged could reasonably have been interpreted as signaling a desire to engage in a generalized discussion of the investigation because Lee asked the question more than two minutes (approximately two minutes and 30 seconds) after receiving an answer to his question about "what" he was being charged with. The dissenting opinion appears to contend that, because Lee had already asked one clarifying question, and because there was a delay between Lee's two questions, Lee's follow-up question about "why" he was charged was not a necessary inquiry or clarifying question about his arrest. It is unclear, however, why the dissenting opinion thinks receiving an answer to a question about "what" one is being charged with makes a question about "why" one is being charged unnecessary. Those questions obviously seek different types of information about one's arrest. Nor is it clear why the dissenting opinion thinks that Lee's delay in asking "why" he was charged changed the nature of the question or otherwise signaled a desire to have a generalized discussion about the investigation — particularly when the majority of the delay (all but approximately 12 seconds) was attributable to the detective initiating a discussion with Lee about what Lee wanted to drink and then being absent from room.

15

that the entire sequence of events culminating in Lee saying, "Let's talk, man," showed that Lee reinitiated communication with Detective Sendling. In particular, the dissenting opinion focuses on the portion of the exchange beginning with Lee saying, "Hey…. Why am I charged with murder, man?" As we have explained, however, "a suspect will be considered to have 'initiated' renewed contact with law enforcement authorities, so as to permit further interrogation, only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." *Scott v. State*, 317 Ga. 799, 804 (2023) (quotation marks omitted). Determining whether a suspect's renewed contact is the product of unlawful past police interrogation requires consideration of

> the entire sequence of events leading up to the suspect's renewal of contact, including but not limited to the lapse of time between any unlawful interrogation and the renewed contact, any change in location or in the identity of the officers involved from one interview to the next, and any break in custody between interviews.

*Russell v. State*, 309 Ga. 772, 778 (2020) (cleaned up). And here, as

16

explained below, Detective Sendling's unlawful interrogation — which the dissenting opinion downplays and disregards — precipitated Lee's ultimate agreement to talk. For that reason, the dissenting opinion errs to the extent that it concludes that Lee reinitiated contact between the time he said, "Hey," and the time he said, "Let's talk, man."

As set out above, and as particularly relevant to the dissenting opinion, the following exchange occurred over an approximately 20-second period:

Lee: Hey.

Detective Sendling: Yes, sir.

Lee: Why am I charged with murder, man?

Detective Sendling: Why are you charged with murder? Why do you think? Remember you don't want to talk to me, so.

[Lee and Detective Sendling stare at each other in silence for several seconds.]

Detective Sendling: So why do you think you were charged?

[Lee remains silent for several seconds. Detective

17

Sendling then turns and moves toward the door as he says the following.]

Detective Sendling: If you tell me you want to talk to me, I'll talk to you.

Lee: Let's talk, man.

As the dissenting opinion acknowledges, because Lee had invoked his *Miranda* rights, Detective Sendling was not permitted to interrogate Lee unless Lee first reinitiated communication. And as explained above, Lee did not reinitiate communication simply by saying "Hey" and "Why am I charged with murder, man?" As a result, Detective Sendling was not permitted to interrogate Lee at that point. Nevertheless, the above exchange shows that Detective Sendling's immediate response to Lee's question about "why" he was charged was to unlawfully interrogate Lee. Cf. *Pauldo*, 309 Ga. at 143–44 (holding that the detective had scrupulously honored the defendant's rights because the detective had only asked "if [the defendant] wanted to talk" and did not "ask[ ] [the defendant] any questions about the case" until after he had fully resolved the ambiguity about whether the defendant wanted to talk).

18

Specifically, Detective Sendling twice asked Lee why Lee thought he had been charged, a question that clearly constituted "interrogation" because any reasonable officer would know the question was "reasonably likely to elicit an incriminating response." *Russell*, 309 Ga. at 777 (quotation marks omitted). These questions were not responsive to Lee's question about "why" he was charged. And the fact that Detective Sendling stared at Lee in silence for several seconds before he posed the question a second time showed that the detective's attempt to elicit incriminating statements from Lee was both considered and deliberate. Then, Detective Sendling further goaded Lee into responding: the detective not only encouraged Lee to respond to the detective's question by saying, "If you tell me you want to talk to me, I'll talk to you," but also made that statement while moving toward the exit, which created time pressure for Lee to respond quickly before the detective could leave the room. See *Taylor v. State*, 303 Ga. 225, 231 (2018) (acknowledging that "any words or actions by law enforcement calculated to elicit an incriminating response," including words or actions that "ask,

encourage, or engage [a defendant] to talk about [the crime]," constitute "interrogation, or its functional equivalent"). The detective's interrogation and move toward the exit while verbally encouraging Lee to respond had an effect on Lee, who promptly agreed to talk and then made incriminating statements in response to further questioning.[6]

Considering the entire sequence of events, we conclude that Lee's agreement to speak to Detective Sendling "was the product of improper interrogation rather than" Lee's "own considered deliberation." *Mack*, 296 Ga. at 250. A total of three minutes elapsed between Lee invoking his *Miranda* rights and saying, "Let's talk, man." And the recording of the interview does not reveal anything that could have prompted Lee to change his mind about talking to the detective before the 20-second exchange in which Detective Sendling interrogated Lee. Further, in the 20 seconds that

---

[6] The dissenting opinion suggests that Detective Sendling's movement toward the door was a mere attempt to scrupulously honor Lee's rights by leaving him alone. Under the circumstances, however, the detective's conduct could just as easily be interpreted as an interrogation tactic designed to elicit an incriminating response from Lee.

immediately preceded Lee's agreement to talk, Detective Sendling twice asked Lee a question that clearly qualified as "interrogation."

As the dissenting opinion notes, after asking Lee the first time why Lee thought he had been charged, Detective Sendling reminded Lee that he had said he did not want to talk. But there is no evidence that the reminder had any impact on Lee's later decision to talk, as Lee did not react to that reminder and maintained his silence. It was only after the detective asked the question a second time and made a move toward the door, encouraging Lee to respond to the interrogation before the detective had time to exit the room, that Lee relented and agreed to talk.

Given that "[t]here was no break in custody" or "change in location or identity of the interrogating officer" between Lee invoking his *Miranda* rights and agreeing to speak to the detective, and given that "a very short lapse in time" of mere seconds separated the unlawful interrogation from Lee's agreement to speak, the record shows that the detective's unlawful interrogation precipitated Lee's choice to discuss the investigation with the

21

detective. *Mack*, 296 Ga. at 249–50. Accordingly, Lee's agreement to talk "was not an effective 'initiation' under *Edwards*," and the statements he made in response to further interrogation must be suppressed. Id. (holding that the defendant's "request to speak with [a detective]," which "was made just minutes after" he had been improperly interrogated, "was the product of improper interrogation" because "[t]here was no break in custody, a very short lapse in time, and no change in location or identity of the interrogating officer from the first interview … to the second" (footnote omitted)); *McDougal v. State*, 277 Ga. 493, 500 (2004) (holding that the defendant did not reinitiate communication because, although the defendant had "summoned the detectives," he did not make any statements indicating an intent to discuss the investigation before the detective interrogated him, and "his only statements were made in response to [the detective's] recommencement of the interrogation").

The dissenting opinion suggests that Detective Sendling's interrogation of Lee by asking Lee why he thought he was charged

is irrelevant here for four reasons, none of which are persuasive. First, the dissenting opinion asserts that Detective Sendling was asking a "rhetorical" question that did not seek to elicit a response the first time he asked Lee why he thought he was charged. But the record belies this characterization. The fact that Detective Sendling gave Lee several seconds to respond to the question, then repeated the question, and gave Lee several more seconds to respond shows that the question was not rhetorical: the detective was seeking to elicit a response.

Second, despite acknowledging that Detective Sendling's second question about why Lee thought he was charged "might be considered interrogation under other circumstances," the dissenting opinion states that it did not constitute interrogation here because, after asking the question, Detective Sendling told Lee that he would talk to Lee only if Lee wanted to talk. But the dissenting opinion ignores the fact that the detective waited several seconds for Lee to respond to the question before saying that he would talk to Lee if Lee wanted to talk. This delay illustrates that the question was

intended to elicit an incriminating response. And under the circumstances — where no statements were made between the detective's interrogation of Lee and the detective's move toward the exit while saying he would talk to Lee if Lee wanted to talk — the detective's statement served to encourage Lee to promptly respond to the detective's interrogation.

Third, citing *Walton v. State*, 267 Ga. 713 (1997),[7] *Wilson v. State*, 275 Ga. 53 (2002), *State v. Brown*, 287 Ga. 473 (2010), *Gray v. State*, 304 Ga. 799 (2018), and *Driver v. State*, 307 Ga. 644 (2020), the dissenting opinion suggests that Detective Sendling's questions did not qualify as "interrogation" because they were asked in response to Lee's question about "why" he was charged, and, as a general rule, a detective's response to a question posed by a defendant does not constitute "interrogation."[8] But, as explained

---

[7] *Walton* was disapproved of on other grounds by *Toomer v. State*, 292 Ga. 49 (2012).

[8] The dissenting opinion characterizes both questions as "responses" to Lee's question, even though they were not responsive to Lee's question. This characterization is inapt, at least with respect to the second question: the context shows that the detective's second question, which followed several

24

below, none of these cases held that responses to a defendant's questions categorically cannot qualify as "interrogation."

In *Walton*, the defendant asked a detective what his co-indictee had said, the detective responded by "summariz[ing] [the co-indictee's] statement," and the defendant made an incriminating statement in response. *Walton*, 267 Ga. at 714, 717–18. Although we acknowledged a prior case in which the defendant had responded to an officer's answer to the defendant's own question and we had held that the defendant's response was not the product of custodial interrogation, see id. at 718 (citing *Delay v. State*, 258 Ga. 229, 231 (1988)), the dissenting opinion misrepresents *Walton* as holding *as a general rule* that an officer's answer to a defendant's question cannot qualify as interrogation.[9] *Walton* did not rely on any such general rule but instead proceeded to analyze whether the

---

seconds of silence, was a response to Lee temporarily maintaining his silence, not to Lee's question. Nevertheless, as explained below, nothing turns on whether the detective's questions can be characterized as "responses."

[9] *Delay* does not stand for that general rule either. See *Delay*, 258 Ga. at 230–31 (holding that the officer did not initiate interrogation by telling the defendant what the officer "assumed [the defendant] was being charged with" in response to the defendant's question, "Why am I being arrested?").

detective's answer to the defendant's question constituted interrogation. See id. And we concluded that, because there was no evidence in the case that the "officer's summary of evidence implicating" the defendant was intended "to get the [defendant] to make an incriminating statement," the detective's answer did not qualify as interrogation, and the defendant's response to the detective's answer therefore "was not the product of custodial interrogation." Id.

It is unclear why the dissenting opinion cites *Wilson* in support of its position. In that case, the defendant "indicated to the police that he wanted to see the autopsy photographs," and after obtaining a *Miranda* waiver and asking a clarifying question to confirm that the defendant "still wanted to see [the autopsy photographs]," the officer "showed him the pictures." *Wilson*, 275 Ga. at 58. As we noted, "[i]t was only after [the defendant] turned to the officer and said he 'wanted to know what had happened to the victim's head,' that the officer 'reversed the question' by replying 'I would like for you to tell me that.'" Id. (punctuation omitted). And we concluded

26

that the defendant had exhibited a "willingness to talk with police ... when he initiated further dialogue with them over the autopsy photographs." Id. at 58–59. *Wilson* did not hold, as the dissenting opinion represents, that reversing a question posed by a defendant does not constitute interrogation as a general matter. Indeed, it is clear from our opinion in *Wilson* that we considered the officer's reversal of the defendant's question to be interrogation. That is why we emphasized that the officer did not "reverse[ ] the question" until "after" the defendant had already reinitiated communication. Id. at 58.

Nor did *Brown, Gray*, or *Driver* hold that, as general matter, a detective's response to a defendant's question cannot constitute "interrogation." *Brown* instead held that the specific comments made by detectives in response to a defendant's questions were permissible because the responses did not seek to elicit incriminating statements and therefore did not constitute "interrogation." See *Brown*, 287 Ga. at 477–78 (holding that the detectives' "responses [to the defendant's questions] d[id] not

27

constitute interrogation or its functional equivalent" because the detectives never "question[ed] [the defendant] about the crimes" and "were not seeking subtly to elicit incriminating information from [the defendant]" but were instead "answer[ing]" or "deflect[ing]" the defendants' "direct questions" and making comments "aimed at effectuating [the defendant's] invocation of his right to have counsel present before questioning" (emphasis omitted)). In *Gray*, we assumed without deciding that the detective's response to the defendant's comment "could be characterized as an interrogation" because whether the response qualified as "interrogation" was irrelevant under the circumstances. *Gray*, 304 Ga. at 804–05. As we explained, it did not matter whether the response constituted "interrogation" because the detective "responded … only *after* [the defendant] brought up the case first," "initiat[ing] the renewed contact." Id. And *Driver* held that a detective's "responses did not violate [a defendant's] previously invoked right to counsel under *Edwards* … because [the defendant's] questions initiated a renewed conversation and evinced a willingness and a desire for a

28

generalized discussion about the investigation." *Driver*, 307 Ga. at 650 (quotation marks omitted).[10]

Moreover, the dissenting opinion's suggestion that a detective is permitted to interrogate a defendant who has previously invoked his *Miranda* rights if the defendant poses any questions to the detective conflicts with our precedent. As we have made clear, scrupulously honoring a defendant's rights requires a detective to refrain from "ask[ing] [a defendant who has invoked his *Miranda* rights] any questions about the case" until after the defendant has reinitiated communication by signaling "a willingness and a desire for a generalized discussion about the investigation." *Pauldo*, 309 Ga. at 133, 144 (quotation marks omitted) (noting that a defendant "may not be subjected to further questioning by law enforcement" after invoking his *Miranda* rights, unless "the suspect initiates the

---

[10] *Driver* quoted *Brown* for the proposition that "a police officer's response to a direct inquiry by the defendant does not constitute 'interrogation.'" *Driver*, 307 Ga. at 650 (cleaned up). But *Driver* cannot be construed as holding that a detective's response to a defendant's direct question cannot constitute "interrogation" even if the response is intended to elicit incriminating statements because the case did not involve any such responses. See id. at 647–48.

29

conversation regarding his case"). And a detective's response to a defendant's question that the detective should know is reasonably likely to elicit an incriminating response falls squarely within the scope of "interrogation." See *Russell*, 309 Ga. at 777 ("In this context, 'interrogation' is defined as 'express questioning by law enforcement officers' or its functional equivalent — any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." (cleaned up)).

Finally, the dissenting opinion suggests that, even if Detective Sendling's questions about why Lee thought he had been charged constituted "interrogation in violation of *Miranda* and *Edwards*," the questions "did not elicit an incriminating response" from Lee, and thus the incriminating statements that Lee ultimately made were not "the product of" that interrogation. *Pauldo*, 309 Ga. at 141–42. This argument, however, is misguided. It is undisputed here that Lee invoked his *Miranda* rights and that the incriminating statements that the State sought to introduce were produced by interrogation occurring immediately after Lee said, "Let's talk,

30

man." Accordingly, the relevant question is whether Lee had reinitiated communication by the time he said, "Let's talk, man," such that further interrogation was permissible. See id. at 133. And to determine whether a valid reinitiation occurred, the relevant question is whether Detective Sendling's questions about why Lee thought he had been charged produced Lee's agreement to speak, not whether those questions produced incriminating statements. See *Mack*, 296 Ga. at 248. As explained above, because the unlawful interrogation produced Lee's agreement to talk, Lee did not initiate communication, and the incriminating statements he made in response to later interrogation are therefore inadmissible in the State's case-in-chief.

3. The State also argues that the trial court erred in concluding that Lee's statements were involuntary as a matter of constitutional due process. We agree.

Statements obtained in violation of *Miranda* and *Edwards* "are inadmissible in the State's case-in-chief," *State v. Philpot*, 299 Ga. 206, 207 (2016) (quotation marks omitted), but they may be used "for

impeachment purposes," *Dyer v. State*, 278 Ga. 656, 658 (2004), so long as they are "voluntary under due process standards," *State v. Troutman*, 300 Ga. 616, 618 (2017) (quotation marks omitted). Statements are voluntary under due process standards if they are "the product of a rational intellect and a free will under the totality of the circumstances." *State v. Franklin*, 318 Ga. 39, 42 (2024) (quotation marks omitted). And the United States Supreme Court has held that "[c]oercive police activity — such as excessively lengthy interrogation, physical deprivation, and brutality — is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Dozier v. State*, 306 Ga. 29, 36 (2019) (cleaned up). See also *Franklin*, 318 Ga. at 42.

Here, the trial court determined that Detective Sendling engaged in coercive police conduct when he restarted a conversation with Lee after Lee had invoked his *Miranda* rights. Specifically, the trial court found that Detective Sendling knew that Lee was "illiterate," had only a "third-grade education," and may have an

32

"intellectual disability." And the court found that the detective capitalized on the situation when he restarted the conversation without rereading Lee his *Miranda* rights or attempting to determine Lee's level of understanding.

However, "[e]ven accepting the trial court's findings of fact, the circumstances" surrounding Lee's interrogation "reveal none of the extreme tactics identified as the hallmarks of coercive police activity offensive to fundamental notions of due process, such as lengthy interrogation, physical deprivation, brutality, or deception." *Troutman*, 300 Ga. at 618 (cleaned up). As noted above, the interrogation was brief. Lee was not physically deprived of anything except his liberty. Indeed, Detective Sendling provided Lee with food and drink before Lee discussed the crime. The record also does not reveal any evidence of brutality or deception, only interrogation and encouragement to speak. And even assuming that Lee had some "intellectual disabilities," the detective's failure to read Lee his *Miranda* rights again — after Lee demonstrated his understanding of those rights by invoking them minutes earlier — is not the kind

of "deliberate tactic[ ] calculated to break the will of the suspect" that qualifies as "coercive police activity" under due process principles. Id. at 618–19 (quotation marks omitted) (holding that the defendant's statement was voluntary, where the defendant was not warned about his *Miranda* rights at all).

Accordingly, the trial court erred in concluding that Lee's statements were involuntary as a matter of constitutional due process. And as a result, the State may use Lee's statements for impeachment purposes if Lee chooses to take the stand at trial.

\* \* \*

As explained above, the trial court did not err in concluding that Lee did not reinitiate communication after invoking his *Miranda* rights. But the trial court's conclusion that Lee's statements were involuntary as a matter of due process was erroneous. Accordingly, we affirm the trial court's suppression of Lee's statements under *Miranda* and *Edwards* and reverse the trial court's exclusion of Lee's statements based on due process principles. As a result, Lee's statements may not be admitted in the

34

State's case-in-chief but may be used to impeach Lee if he testifies

at trial.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Warren, P. J., and Bethel, McMillian, and LaGrua, JJ., who dissent as to Division 2.*

S25A1087.  THE STATE v. LEE.

MCMILLIAN, Justice, dissenting.

Because I believe based on the undisputed video recording of the interview that Lee reinitiated communication with Detective Sendling, I respectfully dissent from Division 2 of the majority opinion.

As correctly explained in the majority opinion, if a suspect invokes the right to remain silent or the right to counsel, or both, then "[p]olice must scrupulously honor" the suspect's rights, which requires that "the *interrogation* [ ] cease immediately."  *State v. Pauldo*, 309 Ga. 130, 133 (2020) (citations and quotation marks omitted).  "However, where police cease interrogation and the suspect initiates the conversation regarding his case" – which, under these circumstances "requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation at hand," then "no violation of the *Edwards* [*v. Arizona*, 451 US 477 (1981)] rule occurs."  Id. at 133, 135, 143.

Stated more succinctly, "police may not immediately subject a defendant who has invoked his right to counsel or his right to remain silent to further interrogation absent reinitiation by the defendant." Id. at 134 n.5 (emphasis omitted). And "a suspect will be considered to have 'initiated' renewed contact with law enforcement authorities, so as to permit further interrogation, only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." *Mack v. State*, 296 Ga. 239, 248 (2014). In this case, because the trial court denied the State's motion in limine based on the video recording of the interview alone and the controlling facts are ascertainable from the recording, we review de novo the trial court's application of the law to those facts. See, e.g., *State v. Leverette*, 320 Ga. 806, 809–10 (2025).

Here, after Lee sat alone in the interview room for about an hour, Detective Sendling entered the interview room and began by introducing himself and asking a few biographical questions to Lee, which included confirming that Lee would be able to understand

37

something read to him. Detective Sendling then read Lee his rights under *Miranda v. Arizona*, 384 US 436 (1966). Lee said that he understood those rights and that he did not wish to speak with Detective Sendling at that time without a lawyer. From that moment, their conversation continued as follows:

DET: "So you don't want to talk?"

Lee: "Nuh-uh."

DET: "Okay."

DET: "Alright, I guess—"

Lee: "What am I charged with?"

DET: "You're going to be charged with murder and aggravated assault."

DET: "Alright."

Here, Detective Sendling gets up from the chair and walks towards the door.

DET: "I'll be back with you in a little bit – I've got some paperwork to do."

DET: "You need anything to drink?"

Lee: "Yeah, I want some, let me get some chips"

DET: "Uhh, I don't know that I have chips, but I have soda, Gatorade, water."

Lee: "Gatorade."

DET: "Blue, yellow, red?"

Lee: "Blue."

DET: "Blue?"

Detective Sendling leaves and shuts the door, but then opens the door again.

DET: "I've also got Pepsi and Mountain Dew, okay, but you want Gatorade?"

Lee: "Yeah."

DET: "Alright."

Detective Sendling leaves and shuts the door. Detective Sendling comes back into the room almost two minutes later.

DET: "I was able to find some chips but these are the only ones I can find."

Detective Sendling puts the Gatorade and chips on the table and then turns towards the door.

Lee: "Hey."

DET: "Yes, sir?"

Lee: "Why am I charged with murder, man?"

DET: "Why are you charged with murder? Why do you think? Remember you don't want to talk to me, so."

Detective Sendling stops speaking, and there is silence for a few seconds.

DET: "So why do you think you were charged?"

Detective Sendling turns towards the door.

DET: "If you decide you want to talk to me, I'll talk to you, but—"

Lee: "Let's talk, man."

DET: "You wanna talk?"

Lee: "Yeah."

From the time that Lee says "Hey" until Lee says "Yeah" in response to Detective's Sendling question is about 21 seconds. The interview proceeds from there.

"[W]e have recognized that substance trumps form in determining whether the entire sequence of events indicates a defendant's voluntary initiation of renewed contact. Accordingly, there is more to the analysis than merely an inquiry into 'who said what when,' and we must consider the context in which a purported

40

'initiation' by the defendant was made before declaring it effective to allow the resumption of police interrogation." *Mack*, 296 Ga. at 247 (citation omitted).

Looking at the context of the entire sequence of events here therefore, I would begin by recognizing – as the majority opinion agrees – that when Lee invoked his rights, Detective Sendling scrupulously honored Lee's invocation by ceasing his interrogation immediately. Id. at 243 ("The determination as to whether the police have scrupulously honored the defendant's right to remain silent rests in part upon their immediate response to the defendant's invocation of the right; a showing of respect for the defendant's right, by immediately ceasing questioning upon its invocation, is a significant factor in this analysis."). Lee then asked "what" he was being charged with, and Detective Sendling answered that Lee was being charged with murder and aggravated assault. This exchange does not constitute an interrogation because as the majority opinion correctly recognizes, suspects may ask clarifying questions about their arrest without evincing a willingness and desire to engage in

a generalized discussion about the investigation, and officers are permitted to respond to such inquiries without it constituting a police-initiated interrogation. See *Pauldo*, 309 Ga. at 143.

But it is at this point in the recording that I depart from the majority opinion's analysis and conclude, based on the totality of the circumstances, that Lee reinitiated contact by saying "Hey" and catching Detective Sendling's attention as the detective was turning to leave the room, and asking "[w]hy am I charged with murder, man?" See *Oregon v. Bradshaw*, 462 US 1039, 1045 (1983) (distinguishing between inquiries "relating to routine incidents of the custodial relationship," such as a request for a drink of water, that "will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*," and those "represent[ing] a desire on the part of an accused to open up a more generalized discussion relating directly *or indirectly* to the investigation" (emphasis supplied)); *Pauldo*, 309 Ga. at 136 ("[I]nitiation under these circumstances requires not only that the defendant speak up first but also that his words reflect a desire to discuss the investigation

at hand." (cleaned up)).

It was Lee who renewed contact without any police-initiated interrogation or prompting, and Lee's questions were not in response to any questions attendant to his arrest and custody. See *Mack*, 296 Ga. at 248 ("[A] suspect will be considered to have initiated renewed contact with law enforcement authorities, so as to permit further interrogation, only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." (cleaned up)). Lee's questioning of Detective Sendling happened as part of a larger custodial interaction between them, wherein Lee had already said he did not want to talk, Lee had already asked and had answered a clarifying question about what he was being arrested for, and Detective Sendling had scrupulously honored Lee's invocation before Lee renewed contact by catching Detective Sendling's attention as he was leaving the interview room and further asking why Lee was being arrested for murder. See *Bradshaw*, 462 US at 1045–46 (holding that suspect's question,

43

"Well, what is going to happen to me now?" "[a]though ambiguous … evinced a willingness and desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship," and "[i]t could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that 'you do not have to talk to me ….'"). In *Pauldo*, we concluded that the suspect "reinitiated contact when he asked questions about *why* he was being arrested and made statements about the crimes being investigated even after being reminded that he had invoked his rights and [] these statements and questions 'evinced a willingness and a desire for a generalized discussion about the investigation.'" *Pauldo*, 309 Ga. at 144 (quoting *Driver v. State*, 307 Ga. 644, 650 (2020)). *Pauldo*, therefore, supports the dissent and need not be overruled in order to hold here that Lee reinitiated communications under these circumstances.

The majority opinion argues that *Pauldo* compels us to hold

44

that Lee's question, "[w]hy am I charged with murder?", has no bearing on reinitiation here because in *Pauldo*, we concluded that some of the suspect's initial questions, asking what he was being arrested for and why, did not alone constitute reinitiation. But in *Pauldo*, the detective initially told the suspect, before the suspect invoked his rights, that he was not being arrested and then later informed the suspect, after he had invoked his rights, that he was being arrested for homicide. Under the totality of *those* circumstances, we concluded that when the suspect asked why he was being arrested for homicide after the detective first told him he would be after previously saying he would not be arrested, the suspect was asking a clarifying question about his arrest. *Pauldo*, 309 Ga. at 131–32, 143. Here, as noted above, Lee had already asked a clarifying question about what he was being arrested for earlier, and Detective Sendling told Lee that he would be charged with murder and aggravated assault, such that when Lee asked over two minutes later and after an intervening discussion about snacks, "[w]hy am I being arrested?", it was not merely a necessary inquiry

45

or clarifying question arising out of the custodial relationship, but could reasonably have been interpreted by the detective as a general inquiry into the investigation that reinitiated discussion with Detective Sendling. See *Mack*, 296 Ga. at 247 ([T]here is more to the analysis than merely an inquiry into 'who said what when,' and we must consider the context in which a purported 'initiation' by the defendant was made ...." (citation omitted)).

I also disagree with the majority opinion's characterizations of Detective Sendling's response to Lee's "why" question as unlawful interrogation. In analyzing Detective Sendling's response, which included asking Lee, twice, "why do you think you were charged?" and reminding Lee that he did not want to talk, we must recognize that those responses were not posed in a vacuum. When Detective Sendling responded to Lee's question by asking "why do you think you were charged?", we cannot ignore, when considering the totality of the circumstances of this particular interrogation, as evidenced by the undisputed video, that Detective Sendling did not initiate the discussion and only spoke at all because he was responding directly

to Lee's unprompted question, "[w]hy am I being charged with murder?" Cf. *Delay v. State*, 258 Ga. 229, 231 (1988) ("By custodial interrogation, we mean questioning *initiated* by law enforcement officers …." (quoting *Miranda v. Arizona*, 384 US 436, 444–45 (1966) (emphasis supplied by *Delay* Court)); see also *Smith v. Illinois*, 469 US 91, 98 (1984) ("With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver 'cannot be established by showing only that [the accused] responded to further *police-initiated* custodial interrogation.'" (quoting *Edwards*, 451 US at 484 (emphasis supplied by *Smith* Court)).

We have previously held that "an accused's response to an officer's answer to a question posed by the accused is not the product of custodial interrogation." *Walton v. State*, 267 Ga. 713, 718 (1997), disapproved on other grounds by *Toomer v. State*, 292 Ga. 49 (2012); see also *Gray v. State*, 304 Ga. 799, 805 (2018). Moreover, we have also concluded in past cases where detectives have "deflected" direct questions from suspects or "reversed the question" that such responses did not constitute interrogation or its functional

47

equivalent. See, e.g., *State v. Brown*, 287 Ga. 473, 477 (2010); *Wilson v. State*, 275 Ga. 53, 58–59 (2002)[11]; see also *Gray*, 304 Ga. at 804–05 (suspect's right to remain silent not violated where detective immediately stopped his interview and physically exited the interview room, and while discussing non-case-related topics afterward, "without any prompting from [another detective], [the suspect] stated that he was being 'framed' for murder" and then replied when his unsolicited comments prompted the detective to ask if that's why he was there). Here, it is clear in context and under

---

[11] The majority opinion distinguishes *Wilson*, arguing that it did not hold that reversing a question posed by a defendant does not constitute interrogation as a general matter and that the suspect in that case had otherwise initiated further dialogue with police over autopsy photographs. I do not disagree that the Court in *Wilson* held that the suspect "initiated further dialogue with [the police] over [ ] autopsy photographs." *Wilson*, 275 Ga. at 58. But that holding appears to be based on the entire sequence of events of the suspect's initiation of further dialogue over the autopsy photographs, including the interaction in which the officer "reversed the question" the suspect had asked back to him, as the Court explained that entire interaction before holding that "the evidence established that Wilson indicated his willingness to talk with police on January 8 when he initiated further dialogue with them over the autopsy photographs." Id. As such, I disagree with the majority's reading of *Wilson* as considering the officer's reversal of the defendant's question to be "interrogation." Rather, the *Wilson* Court viewed it as persuasive that the officer "reversed the question," "only after Wilson turned to the officer and said he 'wanted to know what had happened to [the victim's] head," and "[t]he interrogation continued from that point." Id.

48

the totality of the circumstances that Detective Sendling's two questions to Lee about why Lee thought he was being charged with murder were in response to Lee's unsolicited question about why he was being charged with murder.

The majority opinion characterizes Detective Sendling's questions as "not responsive to Lee's question about 'why' he was charged" and therefore "interrogation because any reasonable officer would know the question was 'reasonably likely to elicit an incriminating response.'" But in context, Detective Sendling's first question was clearly rhetorical. The majority opinion argues that the question was not rhetorical because Detective Sendling paused briefly after asking it, but it would be hard to interpret that brief silence as indicating an intention to elicit a response because right before it, Detective Sendling reminded Lee, "Remember, you don't want to talk to me." As for Detective Sendling's second question, I recognize that it might be considered interrogation under other circumstances. But here, it is hard to see how this question was intended to elicit a response when after asking the question – which,

in fact, did not elicit any response – Detective Sendling told Lee that the detective would only talk if Lee decided he wanted to talk. In context and under a totality of the circumstances, Detective Sendling's questions cannot be considered as "reasonably likely to elicit an incriminating response," *Pauldo*, 309 Ga. at 135, when Detective Sendling continued reminding Lee that he did not want to talk. See *Bradshaw*, 462 US at 1045–46 (concluding that officer's immediate reminder that the accused did not have to talk indicated officer understood accused's ambiguous question as indicating accused's desire to discuss investigation generally); *Brown*, 287 Ga. at 477 (no interrogation where, in response to suspect's continued questions, detective answered or deflected some and "[t]he detective's other statements and actions were aimed at *effectuating* the suspect's invocation").

What's more, Detective Sendling's question, "why do you think you were charged?" elicited no response or agreement to talk at all – only silence. See *Pauldo*, 309 Ga. at 141–42 ("[E]ven if we were to assume that the detective's requests and statements were

50

interrogation in violation of *Miranda* and *Edwards*, they did not elicit an incriminating response from Pauldo.").  It was only after Detective Sendling turned again to leave while saying, "If you decide you want to talk to me, I'll talk to you, but—" Lee interjected, "Let's talk, man."[12]  And before proceeding further, Detective Sendling sought clarity, asking, "You want to talk?"  To which Lee responded, "Yeah," confirming that he was reinitiating communications.

To conclude that Lee's renewal of contact here was merely the product of Detective Sendling's question, "why do you think you were charged?" is to ignore the totality of the circumstances that actually led to Lee reinitiating communications.  I would hold that

---

[12] Citing *Taylor v. State*, 303 Ga. 225, 231 (2018), the majority opinion characterizes the detective's moving toward the exit at the same time as he was saying, "If you decide you want to talk to me, I'll talk to you," as an interrogation tactic to create "time pressure for Lee to respond quickly" because it was an action calculated to elicit an incriminating response. However, leaving a suspect alone seems to be a reasonable way for a law enforcement officer to scrupulously honor a suspect's invocation of the right to silence, and under the circumstances, I cannot conclude that it was obviously an interrogation tactic rather than an effort to honor Lee's rights.  Cf. *Pauldo*, 309 Ga. at 134 ("On the other hand, the law does not require that after a suspect invokes his right to remain silent or his right to counsel, law enforcement must leave the suspect's presence and cease all interaction with him immediately.").

under the totality of the circumstances in this case, Lee reinitiated communications with Detective Sendling when Lee asked, "Why am I charged with murder, man?", and the entire sequence of events before and after that question, in context, supports that conclusion; Lee's "continued efforts to discuss the case" and confirmation of his desire to talk "even after being reminded that he had invoked his rights … 'evinced a willingness and desire for a generalized discussion about the investigation.'" Id. at 144 (quoting *Driver*, 307 Ga. at 650); see also *Driver*, 307 Ga. at 650 (holding that under a totality of the circumstances, "[the investigator's] response to questions [the suspect] initiated and posed to [the investigator] when [the investigator] was preparing to walk out of the room," including asking the suspect where he had shot the victim after the suspect volunteered that he had, "did not render [the suspect's] unsolicited and incriminating admission the product of interrogation that must be suppressed at trial").

Having determined that Lee reinitiated communication with law enforcement, and agreeing with the majority that the trial court

52

erred in concluding that Lee's statements were involuntary as a matter of constitutional due process, I would reverse the trial court's denial of the State's motion in limine to admit Lee's statements in its case-in-chief at trial.

I am authorized to state that Presiding Justice Warren and Justices Bethel and LaGrua join in this dissent.